COOMES ET AL. *v.* AERO THEATRE AND SHOPPING CENTER, INC.

[No. 176, October Term, 1954.]

*Decided June 13, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Johnson Bowie,* for appellants.

*George E. Brown, Jr.,* for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This suit for a declaratory decree and an injunction was brought in the Circuit Court for Baltimore County by Aero Theatre and Shopping Center, Inc., a Maryland

corporation, against Calvert E. Coomes and Eleanor L. Tucker and the Board of Liquor License Commissioners for Baltimore County to enforce a restriction upon the use of a parcel of land situated opposite complainant's shopping center at Middle River.

Complainant, according to Edward F. Perotka, its president, bought the entire shopping center from the Glenn L. Martin Company in 1948. The center includes thirteen stores, a theatre, and a professional building.

In 1949 complainant sold a tract of land located nearby to Harry F. Horney, an oil salesman; but it still owned a smaller adjoining parcel, containing .38 of an acre, which is the land in controversy. As complainant had no use for it, Perotka offered to sell it to Horney. Perotka testified as follows concerning his offer:

"We didn't want to build on it, and yet we didn't want anybody else to build on it that would put up a business that would conflict with my shopping center.

"My experience with Mr. Horney—he is in the oil business—I contacted him and told him we had this small piece of land, and I wanted to know if he could use it. He said 'Yes, we think we can.' I said, 'Mr. Horney, there will be restrictions on this land because I don't want it ever to be used in a way that would conflict with my tenants.' "

Horney agreed to purchase the parcel for $1,350. Perotka presumed that Horney intended to use it in connection with his oil business. He testified that Horney agreed that the land would never be used for the purpose of competing with any business carried on in the shopping center. Similarly, Horney testified that it was his understanding that the restrictions were "to carry for good, whether I sold it or whether I kept the property."

Complainant accordingly conveyed the parcel to Harry F. Horney and Blanche Horney, his wife, by deed dated

October 28, 1949. Included in the deed is the restrictive covenant in question, which reads as follows:

"Subject also the further restriction that the Grantees or their tenants therein will not engage in any business which shall compete with or be of a similar nature of those businesses conducted and maintained on the property known as the Aero Theatre and Shopping Center, Inc."

The Horneys, after owning the parcel more than four years, sold it to Coomes and Miss Tucker for $8,500. The deed, dated November 17, 1953, does not contain any restriction against competition with the shopping center.

One of the businesses in complainant's shopping center is the Aero Restaurant and Tavern. It was to protect this business as well as others that complainant inserted the covenant in the deed to the Horneys. Complainant alleged that Coomes and Miss Tucker had applied to the Board of Liquor License Commissioners for a Class B beer, wine and liquor license with the intention of using it in violation of the restriction.

Complainant prayed the Court (1) to construe the rights and liabilities of the parties under its deed to the Horneys; (2) to enjoin Coomes and Miss Tucker from engaging in any business that would compete with or be of a similar nature to the businesses conducted in the shopping center in violation of the restriction in the deed; (3) to specifically enjoin them from operating a restaurant or tavern on the land conveyed by complainant to the Horneys; and (4) to enjoin the Board of Liquor License Commissioners from considering the application made by Coomes and Miss Tucker for the beer, wine and liquor license.

The chancellor found that complainant was entitled to relief against Coomes and Miss Tucker, but he did not grant an injunction against the Board of Liquor License Commissioners. The decree declares that the restrictions in complainant's deed are binding upon Coomes

and Miss Tucker, their heirs and assigns, and also upon any person hereafter owning or having control, by lease or otherwise, of the premises, having notice, actual or constructive, of the restrictions; and that the application made by Coomes and Miss Tucker for a beer, wine and liquor license is in contemplation of a violation of the restrictions. The decree orders Coomes and Miss Tucker to withdraw their application, and enjoins them from engaging in any business which competes with or is of a similar nature to the businesses conducted in the shopping center.

Coomes and Miss Tucker, appealing from that decree, contended that the restriction in complainant's deed is not binding upon them.

In England it is held that where the burden of a covenant does not run with the land, a restrictive agreement as to the use of land may nevertheless, under certain circumstances, affect a subsequent purchaser of land who takes with notice of the agreement, equity in such a case restraining any use of the land in violation of the agreement. It was stated in the leading English case on the subject, *Tulk v. Moxhay*, 2 Phillips 774, 18 L. J. Ch. 83, that "the question is not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased."

We reaffirm the doctrine that if the owner of land enters into a covenant concerning its use, subjecting it to an easement or personal servitude, and the land is afterwards conveyed to one who has notice of the covenant, the grantee will take the land bound by the covenant and will be compelled in equity to specifically execute it or will be restrained from violating it; and it makes no difference, with respect to this liability in equity, whether or not the covenant is one which runs with the land. *Thurston v. Minke*, 32 Md. 487, 494; *Halle v. Newbold,* 69 Md. 265, 270, 14 A. 662; *Newbold v. Peabody Heights Co.*, 70 Md. 493, 17 A. 372, 3 L. R. A. 579;

*Peabody Heights Co. of Baltimore City v. Willson,* 82
Md. 186, 32 A. 386, 1077, 36 L. R. A. 393; *Clem v. Valentine,* 155 Md. 19, 141 A. 710; *Turner v. Brocato,* 206
Md. 336, 111 A. 2d 855; 2 *Pomeroy, Equity Jurisprudence,* 5th Ed., sec 689.

As pointed out in *Turner v. Brocato, supra,* there are
two opposing theories for the support of enforceability
of restrictive agreements against purchasers with notice.
Chief Judge Cardozo referred to these views in his opinion in *Bristol v. Woodward,* 251 N. Y. 275, 167 N. E.
441, 445, 446, in the following language:

> "One view of these restrictions treats them
> as contracts concerning or relating to the en-
> joyment of the land, to be specifically enforced
> against the promisee [promisor] or against pur-
> chasers with notice, but inoperative as a con-
> veyance of any intests in the land itself. * * *
> Where that view prevails, the statute of frauds
> is held to be irrelevant. * * * The other view
> treats the restrictions, though equitable in ori-
> gin, as creating interests in the land itself, like
> easements at common law. * * * Where that
> view prevails, the statute of frauds is generally
> applied * * *, subject, of course, to the usual
> exceptions on the ground of fraud or part per-
> formance * * *."

While most courts have accepted the theory that re-
strictive agreements should be enforced as an easement
or servitude, Mr. Tiffany took the view that the more
satisfactory theory is that equity regards such an agree-
ment as vesting in the promisee a right to specific en-
forcement by means of an injunction or otherwise, not
only as against the original promisor, but also as against
a subsequent holder of the property, if not a purchaser
for value without notice. He argued that if the right
to equitable relief could not thus be asserted as against
a subsequent holder of the property, the result would
be that the promisee could be deprived of such right, in
practically every case, by a collusive transfer on the part

of the promisor. 3 *Tiffany, Real Property,* 3d Ed., Sec. 861.

There can be no question that, as the American Law Institute has stated, the successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless it was intended by the parties to the promise that they should be so bound. 5 *Restatement, Property,* sec. 531.

It is understood, however, that it is not necessary that the expression of intention shall take any particular form. Of course, if the promise purports to bind successors by the use of such words as "successors" or "assigns", little question can arise as to the existence of the necessary intention. But as the language employed becomes less plain and precise, the conclusion that the successors were intended to be bound must rest in a correspondingly greater degree upon an inference drawn from the circumstances under which the promise was made. The circumstances of a particular transaction may yield such an inference without the aid of any specific language in the terms of the promise.

One of the settled rules of equity in this State is that where it appears that it was the intention of the grantor that restrictions are to be a part of a general plan of development affecting the land granted and the land retained by him alike, such restrictions may be enforced in equity. *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 197 A. 580; *Turner v. Brocato,* 206 Md. 111 A. 855, 860. The fact that a promise was procured by the grantor pursuant to a general plan of development tends strongly to prove that the promise was intended to bind the successors of the promisor. We emphasize, however, that the enforcement of a restrictive covenant by a court of equity is not made to depend upon the existence of a general plan of development, but upon the intention of the parties to the deed in which the covenant is contained to make the covenant applicable to the particular land conveyed.

We turn then to the final question whether Coomes and Miss Tucker had notice of the restrictive agreement. A restrictive agreement cannot be enforced in equity against a subsequent purchaser unless he had notice of it at the time he purchased the property, or was put on inquiry and reasonable inquiry would have led to such knowledge. *Shoyer v. Mermelstein,* 93 N. J. Eq. 57, 114 A. 788; *Sanborn v. McLean,* 233 Mich. 227, 206 N. W. 496, 60 A. L. R. 1212; 3 *Tiffany, Real Property,* 3d Ed., sec. 863.

In the instant case it appeared that Coomes had operated the Aero Restaurant and Tavern in the shopping center as complainant's lessee for several years. Therefore, he was evidently rather familiar with the shopping center and the problems of business there. Perotka testi- fied that when his corporation leased the restaurant and tavern to Coomes, he told him that a package goods store had been in the shopping center ever since it was built, and that he could not lease the restaurant and tavern to him with the privilege of selling package goods. Perotka then testified that he received a complaint from the lessee of the package goods store that Coomes was selling package goods, and it was found upon investigation that the report was true. Coomes promised to stop, but the complaints continued. Perotka then testified that Coomes told him: "If you don't make any fight against me moving across the street, I will discontinue selling package goods." Perotka refused to enter into such a deal, and suit was entered against Coomes to stop him from selling package goods.

Horney testified that Coomes purchased the parcel in controversy through a real estate broker. He said that the broker came to his office and inquired whether the land was for sale. Horney told him: "I am not interested in selling this now. It is not bothering anybody, and we are getting our vegetables out of it in the summertime." The broker then said: "Every piece of property has a value. If you are going to sell it, what would you ask for it?" Horney replied: "About three

or four times what it is worth." He then indicated that he would be willing to sell it for $8,500. When the broker returned several days later, Horney asked him what he was going to build on the lot, and he replied that it would probably be a filling station, as he was buying the property for a man in Dundalk who was building filling stations.

Horney further testified that it was agreed that the broker would make a down payment of 10 per cent of the purchase price, but the broker made an initial deposit of only $100 at that time and promised that he "would be back and make up the difference." Horney thereupon gave the broker a receipt for $100, but there was no written agreement of sale. Before the expiration of thirty days, the broker asked him if he would extend the time of payment another sixty days, and he agreed to do so. Finally the broker appeared and paid the remaining $750 in cash to complete the down payment of 10 per cent. Horney further testified that some time later Perotka told him that he had heard that Coomes was the purchaser.

Horney swore that before he agreed to sell the land, he told the broker that there were restrictions on it. He further swore that when the broker brought the purchasers to his office to make settlement, after they had three months to "study the deed," he told them that "they were going to have a tough fight on their hands getting anything through to compete with anything over at the shopping center." They made no comment, but their attorney said: "That is what we are for. If they care to fight, we will fight."

Our conclusion is that the evidence clearly established (1) that it was the intention of complainant and the Horneys to impose a restriction upon the use of the land that would bind successors in title, and (2) that Coomes and Miss Tucker had notice of the restrictions. It follows that the restriction is binding upon them. The decree of the chancellor must therefore be affirmed.

*Decree affirmed, with costs.*