CLUB MANOR, INC. ET AL. *v.* OHEB SHALOM CONGREGATION OF BALTIMORE CITY ET AL.

[No. 33, October Term, 1956.]

466

*Decided January 2, 1957.*

The cause was argued before BRUNE, C. J., and HENDER-

son and HAMMOND, JJ., and HENDERSON, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*John J. Neubauer* and *Francis X. McDonough,* for appellants.

*Isaac Hecht* and *Richard W. Whitlock,* with whom were *Samuel J. Fisher* and *Reuben Shiling* on the brief, for appellee, The Oheb Shalom Congregation of Baltimore City.

Submitted on brief for appellee, Ella Keyser Miller, by *James H. Cook* and *Harlan & Harlan.*

BRUNE, C. J., delivered the opinion of the Court.

The two principal questions in this case grow out of a restriction upon the use of land. The first concerns the enforceability of the restriction; the second, its meaning. One of the appellants, a respondent below, ("Club Manor"), is the owner of a lot known as No. 7300 Park Heights Avenue in the City of Baltimore. The other appellant, also a respondent below, American Realty Incorporated ("American Realty") is more or less affiliated with Club Manor. American Realty obtained a permit in September, 1955, to build the apartment house at No. 7300 Park Heights Avenue which is referred to below. Club Manor was not incorporated until some months later. The Oheb Shalom Congregation of Baltimore City (the "Congregation"), one of the appellees, and the original complainant in this case, owns the property known as No. 7310 Park Heights Avenue which adjoins Club Manor's property on its northwest side. The other appellee, Mrs. Ella Keyser Miller, the intervening complainant, owns the property known as No. 7228 Park Heights Avenue which adjoins Club Manor's property on its southeast side. (Despite the difference in block numbers, there is no street separating No. 7228 and No. 7300.)

The restriction contained in deeds in Club Manor's chain of title which is directly in issue in this suit prohibits the erection on what is now Club Manor's lot of "more than one residence or dwelling house" within 250 feet of Park Heights

Avenue. Club Manor proposed to build a 19-unit apartment house on its lot, one part of which designated as "Unit A" and designed to contain four separate apartments under one roof was to be located in that portion of the lot which lies within 250 feet of the southwest side of Park Heights Avenue. Club Manor started actual construction work by excavating for the foundation of Unit A, as well as other portions of the building, on January 9, 1956. On January 18th counsel for the Congregation wrote to Club Manor protesting unsuccessfully against the construction of Unit A. This suit, seeking an injunction against the construction of any part of the apartment house within the 250-foot zone, was filed on January 25, 1956, and the case was tried on February 8th. Briefs and somewhat voluminous exhibits were filed after the hearing. The Court's opinion, filed on April 2nd, upheld the applicability and enforceability of the 250-foot setback restriction, and a decree in conformity therewith was filed on April 12th. The appeal is from that decree.

It is admitted that the respondents had full knowledge of the restrictions in the chain of title to the Club Manor lot.

The first of the two main questions is whether or not the setback restriction against more than one residence or dwelling house in the 250-foot zone is enforceable by the complainants, or either of them, against the respondents. This requires the consideration of a number of deeds and of facts and circumstances which may be gleaned from them and from other evidence in the case.

The Congregation acquired title to its property from Samuel M. Hecht and wife by a deed dated September 27, 1955. This property had previously been the residence of the late Moses S. Hecht, and prior to 1905 had been part of a tract known as "Darbyshire" lying between Seven Mile Lane on the south and Slade Avenue on the north, having a frontage of about 1864 feet on Park Heights Avenue between the two streets and having a depth measuring from Park Heights Avenue of about 500 feet or more. In 1905, this tract was acquired by the Baltimore Ground Rent Company of Baltimore City ("The Ground Rent Company").

No plat of Darbyshire appears to have been recorded. There

seems to have been no great promotional effort to sell lots in the tract. On the contrary, The Ground Rent Company sold or conveyed lots occasionally over a period of about thirteen years, beginning in January, 1906. The area has been and continues to be a high grade, suburban, residential development. Apartment houses have now pushed out to the neighborhood, some being on the other side of Park Heights Avenue, which is a wide boulevard, and some being located somewhat nearer to the center of Baltimore City. In 1905 all of Darbyshire was in Baltimore County; since the Annexation Act of 1918 (Chapter 82 of the Acts of that year) all but the northwest portion is in Baltimore City.

The absence of any plat prepared by The Ground Rent Company makes any statement with regard to the number of lots into which it proposed to divide the property somewhat conjectural. From the copies of deeds executed by the Ground Rent Company which appear in the record, it seems that the basic unit was intended to be a lot having a frontage of 100 feet on Park Heights Avenue and a more or less uniform depth of about 500 feet or more, except at the northern end of the tract, where the property narrowed down. However, at the southern end, The Ground Rent Company in July, 1907, sold as a unit a tract fronting 400 feet on Park Heights Avenue (usually referred to below as lot No. 9) to Maurice E. Skinner, who seems to have been very active in the Company's affairs, if, indeed, he did not actually control it. The present division of the lots is shown on a plat dated November, 1931, prepared for tax purposes by the City of Baltimore, a copy of which is filed as an exhibit.

For convenience of identification we shall refer to the various lots by the numbers given them on the tax plat above mentioned. No. 1 is at the northerly end of the tract and has a frontage of about 364 feet on Park Heights Avenue and of about 24 feet on Slade Avenue. It is somewhat irregular in shape and is actually five-sided, but on the plat it looks very much like a triangle with the northerly and westerly corners cut off. Lot No. 9 is at the southerly end of the tract and, as above stated, has a frontage of 400 feet. There are seven other lots shown on the plat between lots Nos. 1 and 9. These

have an aggregate frontage of 1100 feet on Park Heights Avenue. Five of them, Nos. 2, 3, 5, 6 and 8, each have a frontage of 100 feet; lot No. 7 has a frontage of 200 feet, and lot No. 4 has a frontage of 400 feet. Lot No. 5 (No. 7300 Park Heights Avenue) belongs to Club Manor, lot No. 6 (No. 7228 Park Heights Avenue) belongs to Mrs. Miller, and lot No. 4 (No. 7310 Park Heights Avenue) belongs to the Congregation. Where the identification of different parts of lot No. 4 seems helpful, we shall designate each component part thereof having a 100-foot frontage on Park Heights Avenue by a letter as well as by number, that is, as lots Nos. 4A, 4B, 4C and 4D, respectively. Lot No. 4A adjoins lot No. 3 and lot No. 4D adjoins lot No. 5.

Lot No. 8 was the first one conveyed by The Ground Rent Company. By deed dated January 1, 1906, it was granted to a Miss Edwards and to a Miss Barnett. Among the restrictions imposed on this land were a prohibition against the erection of any dwelling or other structure within 100 feet of Park Heights Avenue and another against the erection of more than one residence or dwelling house within 250 feet of that avenue.

By deed dated July 1, 1907, The Ground Rent Company conveyed lot No. 9 to Maurice E. Skinner. The grantor reserved a 30-foot right of way "over the westerly end of said lot * * * for the benefit and use of this lot and the other lots owned by The Baltimore Ground Rent Company comprising part of the tract of land known as Darbyshire binding on said right of way."

Next came a deed from The Ground Rent Company to one Howser, dated March 1, 1908, transferring the leasehold interest in lot No. 6 (now the Miller lot) subject to what we shall call the "standard setback restrictions". The first of these prohibited the erection of any dwelling or other structure within 175 feet of Park Heights Avenue, and the second prohibited the erection of more than one residence or dwelling house within 250 feet of Park Heights Avenue.

Chronologically, the next document in the record is an agreement dated April 6, 1908, between The Ground Rent Company as the first party, Edwards and Barnett as the second parties, and Skinner and wife and a savings bank, which held

a mortgage on lot No. 9, as the third parties. This agreement contained a mutual release of the right of way over lot No. 9, and it also imposed a 175-foot setback provision for any building on lot No. 8, thus superseding or extending the 100-foot setback in the Edwards-Barnett deed to lot No. 8 and bringing lot No. 8 under the standard setback restrictions described in connection with the Howser deed.

By deed dated May 12, 1908, acknowledged by Mr. Skinner as its attorney-in-fact, The Ground Rent Company conveyed five lots—Nos. 4A, 4B, 4C, 4D and 5—to one Frank William Bolgiano, who was the President of The Ground Rent Company. This deed contained the standard setback restrictions, and the 250-foot, single residence restriction was made applicable to each of the five lots, each of which had a frontage of 100 feet.

By a deed dated May 1, 1915, under which Mr. Skinner was also named as its attorney-in-fact, The Ground Rent Company conveyed lot No. 7 to Mr. Bolgiano. This lot had a frontage of 200 feet on Park Heights Avenue. The single residence, 250-foot setback restriction applied to the *whole* of this lot and was thus twice as severe as the restrictions on each of the five 100-foot lots conveyed to Mr. Bolgiano in 1908.

Lot No. 2 was conveyed by The Ground Rent Company to Clara I. Waters, by a deed dated April 7, 1916, which contained the standard setback restrictions.

Next in chronological order came a reconveyance by Bolgiano to The Ground Rent Company of lots Nos. 4A, 4B, 4C, 4D and 5, by deed dated July 14, 1916. This deed is not in the record. (We were informed at the argument that it contained the same restrictions as those contained in the deed of the same lots from The Ground Rent Company to Bolgiano, dated May 12, 1908.)

By deed dated August 21, 1916, The Ground Rent Company conveyed lot No. 1, the roughly triangular lot at the north end of Darbyshire, to Henry F. Westheimer. This deed contained the usual 175-foot setback restriction applicable to any structure, but the 250-foot setback restriction reads as follows: "(4) That not more than one residence or dwelling house shall be erected upon the above described land for a depth of two

hundred and fifty feet from Park Heights Avenue *or any sub-division thereof of less frontage on Park Heights Avenue than one hundred feet.*" (Italics supplied.) We shall revert to these italicized words later.

Lot No. 3 and lot No. 4A (the latter of which had been reconveyed by Bolgiano) were transferred to Mrs. Rose Burgunder by a deed dated April 22, 1919, and were made subject to the standard setback restrictions.

The next and only other departure from the standard setback restrictions in a deed executed by The Ground Rent Company, conveying any of the Darbyshire lots, occurs in a deed dated April 29, 1919, by which The Ground Rent Company transferred to Maurice E. Skinner and to Edwin W. Herrmann (then President of The Ground Rent Company), in proportions of four-fifths and one-fifth, a single tract, without any separate designation of individual lots, which actually consisted of lots Nos. 4B, 4C, 4D and 5, and which had a frontage of 400 feet on Park Heights Avenue. The deed refers to this tract as being part of the land conveyed by Bolgiano to The Ground Rent Company by the deed above mentioned, dated July 14, 1916. The deed to Skinner and Herrmann contained the 175-foot setback clause common to all of the deeds, but the 250-foot clause was very similar to that contained in the Westheimer deed to lot No. 1 and read as follows: "(3) That not more than one residence or dwelling house shall be erected upon *any subdivision of the above described lot having a frontage of less than one hundred feet on Park Heights Avenue* for a depth of two hundred and fifty feet from Park Heights Avenue." (Italics supplied.) No reason for this variation is stated.

A few months later, by a deed dated August 26, 1919, Skinner and Herrmann and their wives conveyed lots Nos. 4D and 5 to Louis Katzenstein and wife. This deed made each of these lots subject to both of the standard setback restrictions and it did not contain the equivalent of the italicized language in the deed to Skinner and Herrmann from The Ground Rent Company.

By a deed dated December 31, 1920, the Katzensteins conveyed lot No. 5 to Philip Kahn and wife. This deed con-

tained the standard setback restrictions, and this deed forms a part of the appellants' chain of title. A later deed in the same chain, dated July 11, 1945, from Maxwell A. Behrend and wife to Nathan T. Fisher and wife, contained the standard setback restrictions, but added one more, which is very similar to the 250-foot restriction contained in the Westheimer deed and in the deed from The Ground Rent Company to Skinner and Herrmann. It reads as follows: "(7) Only one dwelling may be erected *upon any subdivision having a frontage of less than 100 feet on Park Heights Avenue* for a depth of 250 feet from Park Heights Avenue." (Italics supplied.)

For convenience, these variant provisions with regard to the 250-foot setback restriction in the three deeds above mentioned will be referred to as the "modified form."

Despite the somewhat voluminous deeds contained in the record there are many blanks as to the devolution of title of each of the parties. It appears from a statement in the deed from the Behrends to the Fishers that lot No. 5 was at one time owned by Mr. and Mrs. Moses S. Hecht. We are not informed, however, as to the date or dates when Mr. Moses S. Hecht acquired any of the lots now owned by the Congregation or the lot now owned by Club Manor, nor do we have any information in the record as to what restrictions, if any, were contained in the deed from Moses S. Hecht and wife to the predecessor in title of Club Manor.

The modified form of the 250-foot setback restriction clearly contemplates the possible subdivision of the tracts to which it was made applicable. In all likelihood the length of the frontage on Park Heights Avenue of both the Westheimer lot (No. 1) and the Skinner and Herrmann lots (Nos. 4B, 4C, 4D and 5) suggested such a possibility. Indeed, in the case of the Skinner and Herrmann lots, when the land therein comprised had originally been conveyed by The Ground Rent Company to Bolgiano and had been reconveyed by the latter to the former, each of the lots conveyed—Nos. 4A, 4B, 4C, 4D and 5—had been separately described. The irregular shape of lot No. 1 (the Westheimer lot) very probably was an additional reason for departing from the standard 250-foot setback restriction. It is not unreasonable to suppose that

the modified form of the restriction was still intended to afford protection, even though subdivision occurred; but the actual language used tends to obscure, rather than manifest, whatever may have been the true intention.

Doubt as to the meaning of the modified form adds to the difficulty of establishing the existence of a general plan of development. We have a total frontage of 1864 feet on Park Heights Avenue in the original, entire "Darbyshire" tract. 400 feet at the southern end were plainly free of any restrictions. 364 feet at the northern end are subject to a restriction of doubtful meaning. In between these tracts we have an area with an aggregate frontage of 1100 feet, and the persons principally concerned with its development seem to have shifted about between the standard and the modified forms as to 400 of these 1100 feet. In addition, the restriction as to the 200-foot frontage contained in lot No. 7 is actually more severe than the standard restriction applicable to the 100-foot lots. With as few lots as are involved in the whole tract any exceptions to, or exemptions from, the standard restrictions are more significant than would be three or four exceptions among a group of, say, two hundred lots.

Though the difficulty of determining the meaning of the modified form of the 250-foot setback restriction is a serious obstacle to finding the existence of a general plan, it is not the only one.

In finding that such a plan existed, the Chancellor attached some importance to the fact that in 1908 the standard form was made applicable to the lot previously sold to Edwards and another, and fixes the spring of that year as the time when the general plan was determined upon. We feel that this supplemental agreement is a somewhat slender reed upon which to rely, for the very instrument which contained it failed to make the same restriction (or any restrictions for that matter) applicable to the large lot which had been sold to Skinner after the sale to Edwards. Skinner was, however, a party to the supplemental agreement.

A more serious difficulty is that, apart from the supplemental agreement just mentioned, there is nothing to show the existence of a general plan except the restrictions con-

tained in the various deeds executed by The Ground Rent Company to various purchasers and the fact that, with minor exceptions, the original purchasers and subsequent owners of lots in "Darbyshire" adhered to the restrictions in their deeds. There is no showing or suggestion that there was even an unrecorded plat of the area and nothing to show that any purchaser bought in reliance upon the restrictions being a part of a general plan adopted for the benefit of all lot owners. Acceptance of the restrictions by the grantees is acknowledged by them to be a part of the consideration for the deeds, but there is nothing which states that the covenants undertaken by one purchaser were a part of the consideration for the undertaking of like covenants by another purchaser.

This brings us to the next difficulty with the establishment of the complainants' right to enforce the restrictions. This is that none of the deeds (so far as we can discover) contained an express provision to the effect that the setback or other restrictions should inure to the benefit of the heirs and assigns of the grantors. Each deed did, however, purport to bind the grantees and their heirs and assigns. If this suit were brought by any of the original grantors, while still owning land in the immediate vicinity, they would have no difficulty in sustaining their right to enforce the restrictions against purchasers with notice of them. See, for example, *Coomes v. Aero Theatre & Shopping Center, Inc.,* 207 Md. 432, 114 A. 2d 631. If there was a general, uniform plan of development which included the standard 250-foot setback clause, the restriction would be enforceable by the grantees of lots comprehended within the plan. *Adams v. Parater,* 206 Md. 224, 111 A. 2d 590, is a recent example of such a case. Such a restriction may be enforced in equity, whether or not it would amount to a covenant running with the land. *Thruston v. Minke,* 32 Md. 487; *Newbold v. The Peabody Heights Company of Baltimore City,* 70 Md. 493, 17 A. 372; *Levy v. Dundalk Co.,* 177 Md. 636, 11 A. 2d 476; *Turner v. Brocato,* 206 Md. 336, 111 A. 2d 855; *Coomes v. Aero Theatre & Shopping Center, Inc., supra,* and cases therein cited.

Who may enforce a restrictive covenant is a question which depends upon intention and this is ultimately a question of fact.

Where there is a uniform plan of development and a restrictive covenant has been adopted as part of a general scheme, such a covenant may be enforced at the suit of a neighboring owner aggrieved by its breach. *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 128, 197 A. 580, 584; *Levy v. Dundalk Co., supra; Schlicht v. Wengert,* 178 Md. 629, 15 A. 2d 911. In the *Schlicht Case,* Chief Judge Bond speaking for the Court, said: "In the absence of any expression in the conveyances that the restricting covenant was intended to enure to the benefit of vendees of other lots and sub-vendees of the developers, so as to be enforceable by them, it is incumbent upon a party seeking enforcement to show an unexpressed intention by inference from the nature of the plan and development, and the purpose of the restriction, or, in other words, from the circumstances. It would be incorrect to say that the absence of an expression of the intention is decisive. And it would be incorrect to say that any ground of valid inference must be disregarded. An inference which appears with sufficient clearness from any source should be accepted. To this, one reservation should be made, however. It may be questioned whether present testimony by one of the developers as to his meaning and purpose in inserting the covenant in the conveyances is receivable in evidence to support or defeat the contentions of purchasers of lots."

If the deeds had contained language providing that the covenants should run in favor of the heirs and assigns of the grantor, there would have been no difficulty, at least insofar as the Congregation is concerned, in enforcing the restrictions imposed on the Club Manor lot by the deed from the Katzensteins. *Halle v. Newbold,* 69 Md. 265, 14 A. 662. See also *Turner v. Brocato, supra.*

See also a note on *McKenrick v. Savings Bank of Baltimore, supra,* in 2 Md. Law Rev. 265, reviewing that case and numerous other authorities, and *Restatement, Property,* Vol. 5, § 541.

Even if the restrictions had been uniformly imposed by The Ground Rent Company in all of its deeds conveying property in "Darbyshire", this would not, in and of itself, have been sufficient under the views expressed in a number of cases in

this Court to establish the existence of a general plan of development and the enforceability of restrictions by lot owners *inter se.* See *Summers v. Beeler,* 90 Md. 474, 45 A. 19, citing with approval and quoting from *Mulligan v. Jordan,* 50 N. J. Eq. 363, 24 A. 543; *Ringgold v. Denhardt,* 136 Md. 136, 110 A. 321; *Oak Lane Corporation v. Duke,* 196 Md. 136, 75 A. 2d 80. See also *Thompson on Real Property,* Vol. 7, p. 94, § 3608. In the *Oak Lane Case,* there was evidence of long continued acquiescence in numerous violations of restrictions, which was commented upon in explaining the result in *Middleton Realty Co. v. Roland Park Civic League, Inc.,* 197 Md. 87, 78 A. 2d 200, and in *Turner v. Brocato, supra.* The tests stated in *Summers v. Beeler, supra,* are restated in Judge Hammond's full review in *Turner v. Brocato, supra,* of the cases dealing with the question of the existence of a general plan of development and the inference which may be drawn therefrom of the intent that the restrictions under it were intended, not for the personal benefit of the grantor, but rather for the common benefit of those who purchased from him. See also *Best, Restrictions and Restrictive Covenants* [in Maryland], pp. 20-34; *Wood v. Stehrer,* 119 Md. 143, 86 A. 128; *Lowes v. Carter,* 124 Md. 678, 93 A. 216.

In the *Ringgold Case* the evidence rather clearly showed that there was not in fact any general plan, and a part of the land was sold to a church free of restrictions. It was held that, in the absence of a provision in favor of the heirs and assigns of the grantor, the benefit of restrictions imposed upon land sold by the plaintiff's predecessor in title to one of the defendants and resold to the other with notice of the restrictions, did not pass to the plaintiff as the devisee of other land adjacent or near to the defendants' lot. The covenant was held personal to the original grantor, notwithstanding a recital in the deed to the effect that the purpose of the restrictions was to maintain "the present high standard of the surrounding ground of which the aforegoing lot is a part." In the instant case we do not have even the equivalent of that recital.

In *Whitmarsh v. Richmond,* 179 Md. 523, 20 A. 2d 161, some lots in a development were sold without any restrictions, some with restrictions which were the same as those imposed

upon the lot there in question and some with different restrictions. The restrictions there involved were residential in character and prohibited certain types of business uses and "any other kind of business which may prove detrimental to the * * * surrounding property of the first party" (the development company). It was held that no general plan of development was shown to exist and that the restrictions on the lot there in question "were clearly for the benefit of the [development] company, and not for the benefit of its successors and assigns. The Court added (179 Md. at p. 528) : "The record contains no evidence sufficient to establish, as a fact, that in imposing the restrictions in this instance, as well as in other conveyances, the Denmore Company intended the restrictions should be for the common advantage of all purchasers of lots in the same development, or that subsequent purchasers so understood." See also *Wood v. Stehrer, supra,* a converse case, in which the absence of words binding the heirs and assigns of the grantor was held to prevent the burden of restrictions from running against them.

The considerations which stand in the way of drawing the inference that there was a general plan intended to establish restrictions for the benefit of purchasers of lots generally also seem to stand in the way of drawing an inference that the restrictions under the deeds from the Skinners and Herrmanns to the Katzensteins and from the latter to a predecessor in title of Club Manor were intended for the benefit of land retained by the grantors, such as would create an interest in the nature of an easement in the land granted subject to the restrictions in favor of the grantors and their successors in title to the land retained. See *Ringgold v. Denhardt, supra.* Cf. *Clem v. Valentine,* 155 Md. 19, 141 A. 710, where there was very full proof of surrounding facts and circumstances indicating an intention to benefit land retained by the grantors and not merely to protect the grantors personally. See also *Sowers v. Vestry of the Church of the Holy Nativity,* 149 Md. 434, 131 A. 785, where the covenants were expressed as being in favor of the heirs and assigns of the grantor, and the court had no difficulty in finding that many of the restrictions were intended for the benefit generally of purchasers of lots in the development and were enforceable by them *inter se.*

In the present case, there is no issue relating to the credibility of witnesses insofar as the existence or non-existence of a general plan of development is concerned. Most of the evidence is documentary. On the record we feel constrained to differ with the conclusion of the able Chancellor and to hold that the evidence is not sufficient to establish a general plan. As was said in *Scholtes v. McColgan*, 184 Md. 480, at 489, 41 A. 2d 479: "The intention to adopt a general plan of development with restrictions may be indicated in different ways. When it is intended to adopt such a general plan, the simplest method is to include all of the restrictions in every deed, and to state that they bind not only the property conveyed, but also the property retained, and that they are placed upon the property for the benefit of the owners of all parts of it. The mere filing of a plat without restrictions on it does not indicate the adoption of any uniform restricted plan of development. * * * The absence of a plat may be evidence that no general plan of development was contemplated. * * * In other words, the whole question becomes a question of fact, to be determined from all the circumstances in the case. In its consideration, there must be borne in mind the often repeated doctrine that doubts should be resolved in favor of the unrestricted use of property." We have no doubt that Mr. Skinner, who appears to have been a very experienced lawyer in real estate matters, was well aware of how to create restrictions mutually enforceable by and for the benefit of purchasers of lots, if he had desired to do so. We think that it has not been done.

In view of the above holding it becomes unnecessary for us to decide any of the other questions raised.

*Decree reversed, with costs,*
*and bill dismissed.*