# THE FIRST UNITED PENTECOSTAL CHURCH OF HAGERSTOWN *v.* J. CLARKE SEIBERT

## ET AL.

[No. 833, September Term, 1973.]

*Decided August 12, 1974.*

The cause was argued before THOMPSON, DAVIDSON and LOWE, JJ.

*John R. Salvatore,* with whom were *Miller & Miller, P.A.* on the brief, for appellant.

*David K. Poole, Jr.,* for appellees.

THOMPSON, J., delivered the opinion of the Court.

In this case the complainants-appellees sought to enjoin The First United Pentecostal Church of Hagerstown, appellant, from operating a church in a converted dwelling house which had been recently purchased by the church. The case turns upon who has the right to enforce agreements restricting the use of real property. We conclude that the complainants failed to show that any of them were proper persons to enforce the equitable servitudes involved herein and therefore we reverse a decree of the Circuit Court for Washington County granting the requested injunction.

On March 14, 1913, by deed from Lewis J. Orrick, committee, an approximately 187 acre tract of land was granted to Charles E. Hammond. The land was shown on a plat entitled "Prospect Place" and is located in or near the corporate limits of Hagerstown, Maryland. This information was supplied by the briefs. The deed is not in the record. The plat, however, was introduced into evidence and shows that the tract, divided into 476 numbered building lots and ten other large lots designated A through J, lies to the north side of South Prospect Street, which despite its name runs in an

east-west direction. The lettered parcels of land lie to the extreme northern portion of the plat and the lowered numbered lots lie to the south. In the center of the plat is Linwood Road, which runs north and south. In the southern most sector of the plat lies Sherman Avenue which runs east and west parallel to and one block north of South Prospect Street. The next street running east and west is Wellington Avenue which is a very long block north of Sherman Avenue. The precise lot with which we are concerned in these proceedings is numbered 161 and lies at the southeast corner of Linwood Avenue and Wellington Avenue.

Only a few of the conveyances from Mr. Hammond were introduced into evidence. We will summarize those in chronological order:

By deed dated October 29, 1913, Mr. Hammond conveyed three (3) lots, numbered 166, 167 and 168, to David Durben.[1] The deed contained the following restrictions:

"The grantees upon the acceptance of this Deed for themselves their heirs, successors and assigns, covenant as follows: 1. That no factory or saloon, of any kind hospital asylum and no institution of kindred nature and no charitable institution shall be erected or maintained on the premises hereby conveyed. 2. That there shall not at any time be more than two residences on any lot of fifty (50) feet. 3. That no single residence or dwelling house shall be erected on any lot of fifty (50) feet costing less than $1500.00 and no double house on such lot costing less than $2000.00 and that no old building for residence purposes be moved upon or erected on the property hereby purchased. 4. That no residence or dwelling house will be erected or kept on the said land wholly or within 25 feet of the curb line of Linwood Road said condition not to apply to verandas or porches. 5. The said Charles E. Hammond hereby reserves all right title and

---

1. To lots granted by this conveyance, appellees Raymond T. Kimble and Catherine, his wife (lots no. 166-167) trace their title.

interest in and to the trees now planted on said Linwood Road the said grantees hereby promise not to mutilate said trees in any way whatsoever nor to uproot them. 7. That a proper grade will be furnished by the grantor herein and accepted by the grantees for a distance not exceeding the building line herein named. 9. That said lots shall never be sold or leased to any person or persons of African Descent." [2]

On May 9, 1917, Mr. Hammond conveyed to Clarence V. Eldridge,[3] the bulk of the platted land, approximately 319 lots and all ten lettered blocks comprising 138.4 acres, by metes and bounds descriptions rather than by lot numbers. Of these 329 pieces of property only 32 lots were restricted by the following language:

"The grantee upon the acceptance of this deed for himself, his heirs and assigns, covenants with the grantor, his heirs and assigns, that upon the building lots designated as lots Nos. 26, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 214, 215, 217, and 218 as designated upon the plat of "PROSPECT PLACE" recorded in Plat Book 1 Folio 114, one of the land records of Washington County and included in the property hereinbefore granted, the following restrictions and conditions will be observed, to wit: —

1. That no shop, store, factory, saloon or business house of any kind, no hospital, asylum and no institution of kindred nature and no charitable institution shall be erected or maintained on any of the said lots hereby conveyed, but that any

---

2. *See* note 5 *infra.*

3. To lots granted by this conveyance, appellees J. Clarke Seibert and Mary, his wife (lots no. 149-151), David M. Saloom and Anita, his wife (lots no. 157-158), Garrett N. Adams and Naomi, his wife (lot no. 214), William M. Brewbaker and Ida, his wife (lots no. 160, 214), Janice E. Miller (lots no. 217-218), and William F. Wampler and Marie, his wife (lots no. 221-222) trace their title.

improvements which may be hereinafter erected on the said premises shall be used and occupied for residence purposes only and not otherwise.

2. There shall not at any time be more than two residences on any lot of fifty (50) feet.

3. That no single residence or dwelling house shall be hereafter erected on any lot of fifty (50) feet costing less than $1500.00 and no double house on such lot costing less than $2500.00 and that no old building for residence purposes shall hereafter be moved upon or erected on the property hereby purchased. As to lot #26 limits to be $2500 and $3500 respectively.

4. That the fifty (50) feet building line as shown on the plat hereinbefore referred to will be observed.

5. That no stable, chicken-house, closet, or any other outbuildings shall be hereafter placed on said lot that will be objectionable or unsightly, but that all objectionable features will be concealed by the grantees, to the best of their ability.

6. That said lots shall never be sold or leased to any person or persons of African Descent."

Therefore, as shown by this record, after these conveyances, Mr. Hammond retained all but one of the lots on South Prospect Street, all of the lots on the south side of Sherman Avenue and all lots to the east of Linwood Avenue and south of a stone quarry, which was not owned by him but which bordered on the east side of Linwood Road.

On December 14, 1918, Mr. Hammond conveyed to Clarence V. Eldridge [4] 42 lots numbered 161-165, 175-184, and 187-213, comprising approximately 15.73 acres, by metes and bounds description. None of the lots were restricted. This tract lying to the east of Linwood Avenue, south of the quarry, and to the north of lots 82-100, included lot no. 161 with which we are primarily concerned in these proceedings.

---

4. To these conveyances, the appellant (lot no. 161) and appellees Clyde E. Shull and Catherine, his wife (lot no. 163), Thomas Bragunier and Anna, his wife (lots no. 209-210) trace their title.

We now turn to explicate the specific genesis of title to lot no. 161. In the 1918 conveyance from Hammond to Eldridge lot no. 161, among other lots, was conveyed without restriction by a general warranty deed giving further assurances in which the grantor stated: "I have done no act to encumber said property." On January 15, 1923, Charles A. Eldridge and wife and Russell A. Eldridge and wife conveyed lot no. 161 to Industrial Service and Sales Corporation. The lot was further conveyed on April 27, 1925 by Industrial Service and Sales Corporation and Hyman Kushel, Trustee, to Carl Ridenour and his wife. In this conveyance, the grantor conveyed by general warranty deed giving further assurances that he had done no act to encumber said land which was expressly subject to the following conditions and restrictions imposed by the grantor without reference to whether or not they would bind the successors of either party to the deed or inure to the benefit of other purchasers in the development:

"1. That the land hereby conveyed shall be used for residence purposes only.

2. That the building line shown on the plat hereinafter referred to, being 50 feet inside of the front line, will be strictly observed.

3. That no residence is to be erected on any lot hereby conveyed other than a single or double dwelling house.

4. That no dwelling house shall be erected on any 50 foot lot costing less than $3500.00.

5. That no dwelling will be erected facing or adjoining any of the 15 foot alleys.

6. That this property shall never be sold or leased, to any person not a member of the Caucasian race."

The appellant church was conveyed lot no. 161 by deed dated March 16, 1973, from Hazel M. Coleman, widow. It contained a recital as follows:

"The above described property is conveyed subject to the conditions and restrictions contained in the deed from Industrial Service and Sales Corporation

to Carl Ridenour and wife dated April 27, 1925 and duly recorded. . . ."

Whether the appellees are proper parties to seek enforcement of the restrictions presents our threshold question.

Under historic property concepts, a restrictive covenant could be enforced by the parties thereto, but only where it was found that the covenant ran with the land and the successors were in privity of estate with the original covenantor or covenantee could successors to the original parties enforce the covenant. This ancient doctrine has given way to more modern theories in which suits for enforcement are brought in courts of equity which do not require privity of estate. R. Reno, *The Enforcement of Equitable Servitudes In Land*, 28 Va. L. Rev. 951, 973 (1942). In Maryland, it has long been recognized that courts of equity, under appropriate facts, will enforce restrictive agreements, albeit under varied terminology, *e.g.*, reciprocal negative easements, implied equitable reciprocal servitudes or merely equities attached to land. *Turner v. Brocato*, 206 Md. 336, 346, 111 A.2d 855 (1955). *See* C. Clark, *Real Covenants and Other Interests Which "Run with Land"* 170-86 (2d ed. 1947); *but see* 3 Tiffany, *The Law of Real Property* § 861 (1939).

Though modern courts have refused to be bound by technical rules in determining the right to enforce such restrictive agreements in courts of equity, they always have required that the covenant be made with or for the benefit of the party seeking to enforce it. *Clem v. Valentine*, 155 Md. 19, 25, 141 A. 710 (1928). Who was intended to benefit from the covenant, with the correlative right to enforce the restrictions, presents a fact question which turns upon the intention of the original parties to the agreement. *Club Manor v. Oheb Shalom Congregation*, 211 Md. 465, 475, 128 A. 2d 405 (1957). *See* Restatement of Property § 544 (1944); *Annot.*, 51 A.L.R.3d 556, 567 (1973).

The intent of the covenantor and covenantee is manifested in either of two mutually exclusive situations. In one, the intent is that the agreement apply exclusively to the original

parties — a personal covenant. In the other, the covenant may be intended to flow to the subsequent purchasers of other lots or tracts of land — a covenant running with the land. The law in this area was clearly stated in *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 128, 197 A. 580 (1938), quoted in *Turner v. Brocato, supra* at 345-46:

> " 'These cases sufficiently establish as the law of this state these principles: That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development.' "

For a further expression of the same principles:

> " 'Where the same vendor, selling to several persons plots of land, parts of a larger property, exacts from each of them covenants imposing restrictions upon the use of the plots sold, without putting himself under any corresponding obligation, it is a question of fact whether the

restrictions are merely matters of agreement between the vendor himself and his vendees, imposed for his own benefit and protection, or are meant by him, and are understood by the buyers, to be for the common advantage of the several purchasers. If the restrictive covenants are simply for the benefit of the vendor, purchasers of other plots of land from the vendor cannot claim to take advantage of them. * * *

" 'The question whether it is intended [that] each of the purchasers shall be liable, in respect of those restrictive covenants, to each of the other purchasers, is a question of fact, to be determined by the intention of the vendor and of the purchasers, and that question must be determined upon the same rules of evidence as any other question of intention.' " *Whitmarsh v. Richmond,* 179 Md. 523, 528-29, 20 A. 2d 161 (1941).

See *Club Manor v. Oheb Shalom Congregation, supra* at 475. In the instant case there was no expression of intent that subsequent purchasers be benefited.[4A] Unless an implied intent to that effect can be found, the appellees have no right to enforce the residential use restrictions.

Whether a restrictive covenant is personal to a grantee or grantor or both, or whether it binds their respective successors in title and so the land by whomsoever owns it from time to time, as well as the question of whether the grantor intended to bind the land retained by him present questions of intention which may be ascertained from the language of the conveyances alone or from that language together with other evidences of intent. *Gnau v. Kinlein,* 217 Md. 43, 48, 141 A. 2d 492 (1958). In the absence of express promises in the conveyances that the restrictions were

---

4A. It is true that in one deed from Hammond to Eldridge, dated May 9, 1917, there was an expression that the restrictions should be binding on the heirs and assigns of both the grantor and the grantee, however, the limitation of the restrictions to a small portion of the total lots thereby conveyed indicated a clear intent that no other lots were to be bound by those restrictions.

intended to be for the common benefit and advantage of vendees and subvendees "* * * it is incumbent upon a party seeking enforcement to show an unexpressed intention by inference from the nature of the plan of development and the purpose of the restrictions, or, in other words from the circumstances." *Schlicht v. Wengert,* 178 Md. 629, 634, 15 A. 2d 911 (1940).

Although the deed to the church does not expressly specify that the restriction is to benefit and be enforced by subsequent landowners in the development, such a result would be implied from proof that the restrictions were pursuant to a common plan or scheme of development. As explained by the Court in *Turner v. Brocato, supra,* at 349:

> "As a test of whether there is a common plan or scheme of development which permits the inference of intent that the restrictions were not for the personal benefit of the grantor, but rather for the common advantage and benefit of all who purchased from him, this Court has used the language of *Mulligan v. Jordan* (N.J.) 24 A. 543, at p. 544 (quoted in *Summers v. Beeler* and *Ringgold v. Denhardt,* both *supra*), that this inference is to be confined to cases ' * * * where there has been proof of a general plan or scheme for the improvement of the property, and its consequent benefit, and the covenant has been entered into as part of a general plan to be exacted from all purchasers, and to be for the benefit of each purchaser, and the party has bought with reference to such general plan or scheme, and the covenant has entered into the consideration of his purchase.' "

The existence of such a plan of development may be proven by direct or circumstantial evidence:

> "The intention to adopt a general plan of development with restrictions may be indicated in different ways. When it is intended to adopt such a general plan, the simplest method is to include all

of the restrictions in every deed, and to state that they bind not only the property conveyed, but also the property retained, and that they are placed upon the property for the benefit of the owners of all parts of it. The mere filing of a plat without restrictions on it does not indicate the adoption of any uniform restricted plan of development. * * * The absence of a plat may be evidence that no general plan of development was contemplated. * * * In other words, the whole question becomes a question of fact, to be determined from all the circumstances in the case. In its consideration, there must be borne in mind the often repeated doctrine that doubts should be resolved in favor of the unrestricted use of property." *Scholtes v. McColgan,* 184 Md. 480, 489-90, 41 A. 2d 479 (1945).

See 5 *Powell on Real Property* ¶ 679 (1971); II American Law of Property § 9.29 (1952). For a most recent pronouncement of the law in this area by the Maryland Court of Appeals *see Steuart Transportation Company v. Ashe,* 269 Md. 74, 87-89, 304 A. 2d 788 (1973).

We now turn to the facts of the instant case. The chancellor, without discussion of the evidence, found a common plan of development existed and therefore permitted the appellees to enforce the residential use restrictions:

"The Court finds that there was a clear intent on the part of the various grantors to restrict this immediate neighborhood to residential use only and that this restriction was not for the benefit of the grantors, but was instead for the benefit of the various grantees involved. Several of the Petitioners testified that they knew about the residential only restriction and relied upon it as they surely had a right to do."

The residential use restriction imposed by Industrial Sales and Service Corporation, et al., in its conveyance in 1925 would clearly preclude, as a non-residential use, the use of

the subject property as a church. The minister of the church who acted as its agent in purchasing the property testified that he was aware of such a restriction but considered it not to be valid since racial restrictions were no longer valid.[5] This residential use restriction could be enforceable, as an express agreement, by the original grantors who still owned land in the immediate vicinity, but none of them are parties hereto. This deed does not contain an expression that the restrictions would inure to the benefit of the heirs and assigns of the grantors or that they were to be enforceable by any of the neighboring property owners in the development, thus none of the complainants herein can enforce the restrictions on the basis of express agreement among the covenanting parties. See *Club Manor v. Oheb Shalom Congregation, supra* at 476.

If there were a uniform plan of development, however, an intent could be inferred that any of the owners of land within the development could enforce the restrictive convenants against any other owner of land subject to the restrictions. *Club Manor v. Oheb Shalom Congregation, supra* at 475; *Turner v. Brocato, supra* at 345-46; 5 *Powell on Real Property* ¶ 679; II American Law of Property § 9.30; Restatement of Law of Property § 544; 3 Tiffany, *The Law of Real Property* § 865. The inference of a common plan of development could arise from the aforementioned conveyances by Charles E. Hammond, the common grantor to all the parties; we look to these three conveyances to see whether they evidence an intent to bind all the lots in the development to a residential use restriction and, thereby, to benefit and enable all landowners in the development to enforce the restrictions.

It will be observed that Mr. Hammond, the only owner of the entire tract of platted land, by deed dated October 29, 1913, conveyed lots nos. 166, 167 and 168 with restrictions which would have precluded the erection of a church. On

---

5. The Supreme Court, in *Shelley v. Kraemer*, 334 U. S. 1, 20, 68 S. Ct. 836, 845, 92 L. Ed. 1161 (1948), held that racially restrictive covenants violated the equal protection clause of the 14th amendment to the United States Constitution and were therefore unenforceable.

May 9, 1917, he conveyed the bulk of the 480 odd lots but imposed restrictions on only 32 of them. On December 14, 1918, he conveyed 42 of the lots, including the church's lot involved herein, lot no. 161, without any restrictions. In addition, the plat of the entire tract, Plaintiff's Exhibit 3, was introduced into evidence showing a building line 50 feet back from the streets on all numbered lots; yet in Mr. Hammond's first deed he imposed a setback line of only 25 feet on the three lots conveyed whereas on 32 of the many lots conveyed in his second deed, he imposed a 50 foot setback line. As we previously mentioned, no restrictions at all were imposed in his third deed which included the subject property. On the basis of conveyances it cannot be said that Mr. Hammond showed any intention to impose a uniform plan of restrictions on the land conveyed or retained by him. *Whitmarsh v. Richmond, supra* at 527-28.

It should also be observed that the first restriction shown in this record on any of the 42 lots conveyed by Mr. Hammond without any restrictions was in the deed from Industrial Service Sales and Hyman Kushel, Trustee, to Carl Ridenour and Verda Ridenour, his wife, dated April 27, 1925, but there is nothing in the record to show what, if any, other land the grantors owned at the time that conveyance was made. Indeed the only lots in the unrestricted tract which were shown to be the property of any of the complainants are lots nos. 209 and 210 which were conveyed to the plaintiffs, Thomas F. Bragunier and Anna E. Gragunier, his wife, in 1956 and in that deed there was no reference to any restrictions. Thus it is clear that the complainants failed to establish any general plan insofar as conveyances were concerned with reference to any of the land conveyed to Clarence V. Eldridge by Charles E. Hammond.

Mr. Bragunier testified that his property was restricted to residences only, however, we find no evidence of residential use restriction from his deed, nor from our record of prior deeds in his chain of title. At this point it should be noted the mere fact that the property developed as residential does not of itself warrant a belief in the purchasers that they can restrict use of the neighbors' property to residential in the

future. 51 A.L.R.3d at 640. Indeed the insertion of identical restrictions in all deeds is not sufficient to permit the subsequent grantees of the grantor to enforce such restrictions in the absence of language binding the heirs and assigns of the grantor. *Club Manor v. Oheb Shalom Congregation, supra* at 476-77; *Turner v. Brocato, supra* at 352. The conveyance of several lots without restrictions does not of itself preclude a finding of an intent that there should be a general comprehensive plan, however, in the instant case we are faced with the fact that most of the lots were conveyed without restrictions.

About half of the complainants testified that at the time they bought their property, they thought it was restricted to residential use only. This testimony was accurate with reference to most of the complainants. There was no one, however, whose testimony showed what the intention of the original grantor, Mr. Hammond, was, nor was there any testimony showing the intention of Industrial Service Sales or Hyman Kushel, Trustee, nor was there any testimony by any of the original purchasers from either of these grantors. Under these circumstances, it appears the finding of the chancellor that there was a general plan was not supported by the evidence.

The appellees argue the question of the intention of the original grantor is a question of fact and we are bound by the clearly erroneous rule, Md. Rule 1086. With that, we are entirely in accord. We hold as did the Court in *Club Manor v. Oheb Shalom Congregation, supra* at 479, "In the present case there is no issue relating to credibility of witnesses insofar as the existence or non-existence of a general plan of development is concerned. Most of the evidence is documentary. On the record we feel constrained to differ with the conclusion of the able Chancellor and to hold that the evidence is not sufficient to establish a general plan."

We have examined the language of the conveyances as well as all other evidence of intent and find that the complainants failed to meet their burden of establishing that the restrictions were imposed for their benefit. We hold the chancellor to have been clearly erroneous in finding from

the evidence in this record a common plan or scheme of development.

*Decree reversed.*
*Appellees to pay costs.*