68 A.3d 843

LONG GREEN VALLEY ASS'N, et al.

v.

BELLEVALE FARMS, INC., et al.

No. 65, Sept. Term, 2012.

Court of Appeals of Maryland.

June 24, 2013.

---

Michael R. McCann (Michael R. McCann, P.A., Towson, MD), on brief, for Petitioners.

Steven M. Sullivan, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore, MD and Craig A. Nielsen and Thomas F. Filbert, Assistant Attorney Generals, Department of Agriculture of Annapolis, MD), on brief, for Respondents.

John B. Gontrum (Jennifer Ryan Lazenby of Whiteford, Taylor & Preston, LLP, Towson, MD), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA, JOHN C. ELDRIDGE (Retired, Specially Assigned) and IRMA S. RAKER (Retired, Specially Assigned), JJ.

HARRELL, J.

The question of first impression presented by this case is whether the agricultural preservation easement at the heart of the dispute, purchased by a Maryland state agency from a private landowner, constitutes a charitable trust, under Article 14 of the Maryland Estates and Trusts Article, affording non-party "interested persons" standing to seek to enforce the provisions of the easement? Our answer is "No."

Bellevale Farms Limited Partnership ("Bellevale") and Robert E. and Carol A. Prigel ("the Prigels") own and operate Bellevale Farms, Inc. ("Bellevale Farms"), as an organic dairy farm, on 199 acres in the Long Green Valley area of Baltimore County.[1] In 1997, Bellevale sold an agricultural preservation easement on Bellevale Farms ("the Bellevale Easement") to the Maryland Agricultural Land Preservation Foundation ("MALPF"), a state agency that administers a program to preserve and stimulate Maryland's agricultural land and agrarian economy, respectively. A decade later, Bellevale requested the MALPF to permit, under the terms of the easement, the construction of a creamery operation (currently operated by Prigel Family Creamery, Inc.) on Bellevale Farms that would market to the public locally-produced dairy products. This venture was opposed by Petitioners here, the Long Green Valley Association ("LGVA"), a community association of Long Green Valley residents dedicated to the preservation of the "open space, farmland, natural resources . . . and the heritage and character of the Valley," and John W. and Susan M. Yoder ("the Yoders"), who own real property adjacent to Bellevale Farms. The MALPF approved the proposal.

Petitioners filed a Complaint against Bellevale, Bellevale Farms, the Prigels, the Prigel Family Creamery, and the MALPF in the Circuit Court for Baltimore County, seeking (as relevant to the question presented in the case before us) a declaration that the creamery violated the Bellevale Easement and an order prohibiting the construction and operation of the creamery. The Circuit Court concluded that Petitioners

---

1. For the sake of simplicity, we refer collectively to Bellevale Farms Limited Partnership, the Prigels, Bellevale Farms, Inc., and Prigel Family Creamery, Inc. as the "Bellevale Respondents" throughout this opinion.

lacked standing to enforce the Bellevale Easement. Petitioners appealed to the Court of Special Appeals, arguing that they possessed standing as third-party beneficiaries to the easement, as "aggrieved" parties, and/or as "interested persons" under Md.Code (1974, 2011 Repl.Vol.) Est. & Trusts Art., § 14–302(a) because the Bellevale Easement constituted a charitable trust. With regard particularly to Petitioners' latter claim to standing, the intermediate appellate court held that the Bellevale Easement did not create a charitable trust. *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 683, 46 A.3d 473, 501 (2012). Accordingly, it affirmed the judgment of the Circuit Court as to the Petitioners' lack of standing under the charitable trust theory. *Id.*

We granted Petitioners' Petition for Writ of Certiorari. 428 Md. 543, 52 A.3d 978 (2012). We shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

### A. The Relevant Regulatory Scheme—The Maryland Agricultural Land Preservation Program

The MALPF is a State agency within the Maryland Department of Agriculture. The agency's purpose is to preserve the State's agricultural land and economy by acquiring "agricultural easements" through a statutorily-created funding program called the Maryland Agricultural Land Preservation Fund ("Fund"). *See* Md.Code (1973, 1999 Repl.Vol.), Agric. Art., §§ 2–501,[2] 2–504(3), 2–510(k)(1). The MALPF is required "to attempt to preserve the minimum number of acres which may reasonably be expected to promote the continued

---

**2.** Section 2–501 of the Agriculture Article provides:

(a) *In general.*—It is the intent of the Maryland General Assembly to preserve agricultural land and woodland in order to:

(1) Provide sources of agricultural products within the State for the citizens of the State;

(2) Control the urban expansion which is consuming the agricultural land and woodland of the State;

(3) Curb the spread of urban blight and deterioration; and

(4) Protect agricultural land and woodland as open-space land.

availability of agricultural supplies and markets for agricultural goods." Agric. §§ 2–502(d), 2–509(d)(3).

Any parcel of land preserved through these efforts by the MALPF must be suitable for profitable farming. Hence, each parcel easement considered for purchase must "meet productivity, acreage, and locational criteria determined ... to be necessary for the continuation of farming" and must be "actively devoted to agricultural use." Agric. §§ 2–509(d)(1), 2–509(b)(1). To this end, the MALPF may not purchase an easement unless (a) the land meets the minimum statutory criteria determined to be necessary for the continuation of farming; and, (b) the easement and the county regulations governing the use of land permit:

(1) Any farm use ...

(2) [The] [o]peration at any time of any machinery used in farm production or the primary processing of agricultural products.... [and]

(3) All normal agricultural operations ... including, but not limited to, [the] sale of farm products produced on the farm....

Agric. § 2–513(a). The MALPF program requires also that farming of preserved land must be feasible; however, the MALPF has the discretion to allow a landowner, whose land is subject to an easement, to use the land for "farm and forest-related uses and home occupations." Agric. §§ 2–514(a), 2–513(b)(1)(i).[3]

Participation in the MALPF program is quite competitive. Any owner of land that is committed to agricultural use may apply to sell to the MALPF an easement in his or her land.[4] *See* Agric. § 2–510. According to Agric. § 2–511(a), the

---

3. For those easements purchased by the MALPF before 30 September 2004, Agric. § 2–514 permits a landowner to apply to the MALPF to terminate the easement if, after twenty-five years following the purchase of the subject easement, profitable farming becomes no longer feasible.

4. At the time the Prigels chose to sell an easement on Bellevale Farms to the MALPF, a landowner was granted the right to offer to sell to the MALPF an agricultural land preservation easement if he or she (1)

MALPF may pay only "the [owner's] asking price or the difference between the fair market value of the land and the agricultural value of the land, whichever is lower." A statewide competition ensues among offerees hoping to receive an offer from the MALPF to buy easements. Generally, landowners discount their asking price in order to increase their chance of having an offer accepted. In the statewide stage of the competition, the landowner's asking price is a crucial factor because applications "are assigned a rank in ascending order with respect to the proportion obtained by dividing the owner's asking price by the State easement value." Agric. § 2–510(f)(2)(i).

Once the MALPF purchases an easement, the easement is enforceable by the landowner, the MALPF, and its Board of Trustees. *See* Agric. § 2–513(c) (stating that the "[p]urchase of an easement by [the MALPF] does not grant the public a right of access or a right of use" of the land subject to the easement). Standard deeds of easement provide that the MALPF has a right of entry for inspection and enforcement of the easement. *See* 1974 Md. Laws, ch. 642. This provision has been a common part of the MALPF's typical deeds of easement since the MALPF's governing statute was enacted initially in 1974. *Id.* The MALPF may impose, moreover, civil penalties when a landowner violates the deed of easement or a regulation governing the MALPF program. *See* Agric. § 2–519.[5]

## B. Establishment of the Bellevale Easement

As noted earlier, Bellevale owns and operates Bellevale Farms, an organic dairy farm, on approximately 199 acres in

---

sought approval from the county and from the MALPF to place land into an agricultural district; and, (2) agreed keep the land in agricultural use for a particular time period. The requirement that a landowner place his or her land into an agricultural district to become eligible to offer to sell an easement to the MALPF was eliminated by statute in 2007. *See* 2007 Md. Laws, ch. 650.

**5.** Agric. § 2–519 was adopted in 2009, and applies "only prospectively" to any violation occurring after 1 October 2009. 2009 Md. Laws, ch. 24.

the Long Green Valley area of Baltimore County, Maryland. The Prigels are partners of Bellevale and owners of Bellevale Farms. They also operate a creamery business, called Prigel Family Creamery, on Bellevale Farms. The 199 acres is in the "rural conservation" zone classification of the Baltimore County Zoning Regulations ("B.C.Z.R."), entitled "R.C.2." [6]

On 12 January 1997, Bellevale, after competing in the rigorous MALPF program application process, offered to the MALPF an agricultural preservation easement ("the Bellevale Easement") on Bellevale Farms. The MALPF accepted Bellevale's offer and purchased the Bellevale Easement for $796,500.[7] The Easement Agreement designated Bellevale Farm Limited Partnership as the "Grantor," and "the State of Maryland, to the use of the Department of Agriculture on behalf of the Maryland Agricultural Land Preservation Foundation, ... [as the] Grantee[.]" [8] The deed of easement stated that it is

the intention of the parties that the said land shall be preserved solely for agricultural use in accordance with the provisions of the Agriculture Article, Title 2, Subtitle 5 [9]

---

**6.** A primary purpose of the rural conservation zoning classification is to "create a framework for planned or orderly development" of land in Baltimore County. B.C.Z.R. § 1 A00.2.

**7.** The assessed fair market value of Bellevale Farms, as an operating dairy farm, was $1,062,000 at the time.

**8.** The Prigels and Prigel Family Creamery are not mentioned in the Bellevale Easement.

**9.** Subtitle 5 of the Maryland Agriculture Article, Title 2, governs the statutory authority and powers of the MALPF and the MALPF Fund. Section 2–513, in particular, establishes the permissible uses for land for which the MALPF purchases an easement. At the time the Bellevale Easement was created in 1997, Section 2–513 of the Agriculture Article provided, in pertinent part:

(a) *Provisions to be included in easement and county regulations.*— Agricultural land preservation easements may be purchased under this subtitle for any land in agricultural use which meets the minimum criteria established under § 2–509 if the easement and county regulations governing the use of the land include the following provisions:

... and that the covenants, conditions, limitations and restrictions hereinafter set forth, are intended to limit the use of the above described land[.]

The section of the Easement Agreement entitled "COVENANTS, CONDITIONS, LIMITATIONS, AND RESTRICTIONS" provides:

[A](1)(a) Except as otherwise provided in this instrument, the above described land may not be used for any commercial, industrial, or residential purpose. . . .

[A](3) The Grantor reserves the right to use the above described land for any farm use, and to carry on all normal farming practices . . . including any operation directly relating to the processing, storage, or sale of farm, agricultural or woodland products produced on the said above described land. . . .

[B](6) If the Grantor has any doubts concerning the easement, covenants, conditions, limitations or restrictions herein contained with respect to any particular use of the said land, the Grantor may submit a written request to the Grantee for consideration and approval of such use . . .

---

(1) Any farm use of land is permitted.
(2) Operation at any time of any machinery used in farm production or the primary processing of agricultural products is permitted.
(3) All normal agricultural operations performed in accordance with good husbandry practices which do not cause bodily injury or directly endanger human health are permitted including, but not limited to, sale of farm products produced on the farm where such sales are made.
(b) *Use for commercial, industrial, or residential purposes.*
(1) Except as otherwise provided in this section, a landowner, whose land is subject to an easement, may not use the land for any commercial, industrial, or residential purpose.
(2) Except as provided in paragraph (5) of this subsection, on written application, the Foundation shall release free of easement restrictions only for the landowner who originally sold an easement, 1 acre or less for the purpose of constructing a dwelling house for the use only of that landowner or child of the landowner subject to the following conditions. . . .
Section 2–509 of the Maryland Agriculture Article authorizes the adoption by the MALPF of regulations and procedures.

[B](9) This easement shall be in perpetuity, or for so long as profitable farming is feasible on the Grantor's land and may be released only by the Grantee as provided by Agriculture Article, Section 2–514[.]

The Bellevale Easement Agreement provides several methods by which the parties may enforce compliance with its "covenants, conditions, limitations and restrictions." First, if any provision of the Easement is violated or breached, the Agreement provides that the MALPF may pursue injunctive relief and "take such other legal action as may be necessary" to enforce the conditions of the Easement Agreement. Second, if Bellevale has "any doubts concerning the easement" or its provisions "with respect to any particular use of the said land, [Bellevale] may submit a written request to [the MALPF] for consideration and approval of such use." The Agreement states that the Bellevale Easement creates rights and obligations only in Bellevale (and its representatives, successors, or assigns) and the State of Maryland, as represented by the MALPF, because the Easement "does not grant the public any right to access or any right of use" of Bellevale Farms. Third, the deed instrument entitles the MALPF to "enter the land from time to time for the ... purpose of inspection and enforcement of the easement." Lastly, the Easement Agreement provides that it is "governed by the laws of the State of Maryland[,] and the parties hereby expressly agree that the courts of the State of Maryland shall have jurisdiction to decide any question arising hereunder...."

On or about 1 August 2007, Bellevale proposed to construct a 10,000 square foot creamery operation on Bellevale Farms to process raw milk into organic dairy products, and to market these products to the general public. The Prigels stated that the aim of the operation is to keep the sale of the organic dairy products "in house" by processing and selling locally the products made under the Prigel Family Creamery label. The proposal included a retail farm store of an additional 1,500 square feet in which to sell organic dairy products directly to

the public,[10] a parking lot for eight vehicles, and employment of approximately fourteen full-time and part-time employees. The Prigels sought approval from the MALPF to commence the construction.[11]

Pursuant to its authority under Agric. § 2–513(b)(1)(i), and after being advised that the Baltimore County Agricultural Land Preservation Advisory Board reviewed Bellevale's request and endorsed it, the MALPF gave its approval on 23 October 2007.[12] The MALPF "determined that the operation was a 'farm related use' that complements the Prigels' organic dairy operation—a use that is compatible with agriculture and [the] MALPF's program." [13]

### RELEVANT DIRECT AND COLLATERAL PROCEDURAL HISTORY

#### A. Before the Deputy Zoning Commissioner for Baltimore County

On 4 April 2008, the Yoders and the Long Green Valley

---

**10.** According to an MALPF memorandum regarding the Prigels' proposal to establish the farm store, "Mr. Prigel [was] aware that under MALPF regulations that 75% of the products sold at his stand must be produced on his farm." Thus, up to 25% of the products could be sourced from other local farms.

**11.** While the present case was pending, Respondents obtained the necessary local permits and completed construction of the creamery.

**12.** The language of Section 2–513 in 2007 is identical to the language in the 1997 version of the same provision, except that, under § 2–513(b)(1), the 2007 statute stated (and states currently):

(b) *Commercial, industrial, or residential use of land prohibited.*
(1) A landowner whose land is subject to an easement may not use the land for any commercial, industrial, or residential purpose **except:**
**(i) As determined by the Foundation, for farm- and forest-related uses and home occupations; or**
**(ii) As otherwise provided under this section.**
(Emphasis added.)

**13.** This is excerpted from an affidavit of James Conrad, the then-Executive Director of the MALPF, filed during the litigation of the present case.

Association[14] filed a "Petition for Special Hearing" before the Deputy Zoning Commissioner for Baltimore County asking that local official to determine, among other questions, "whether a dairy processing facility is permitted in an R.C.2 zone[,]" pursuant to Sections 500.7 and 500.6 of the B.C.Z.R.[15] One of those who testified at the public hearing was Wally Lippincott, Jr., an employee of the Baltimore County's Department of Environmental Protection and Resource Management with extensive experience working with the R.C.2 regulations. He stated that commercial agriculture is the preferred use in the R.C.2 Zone and is "afforded preferential treatment over other permitted uses."

In his written decision, filed on 12 August 2008, the Deputy Commissioner concluded that the proposed creamery was consistent with being a "farm," under the definitions of "farm" and "dairying" in the B.C.Z.R., because the "[L]egislature specifically intended to include the storage, production, distribution and sale of milk, butter, cheese, and milk byproducts as permissible uses in the R.C.2 Zone." Evidence found persuasive by the Deputy Commissioner was the MALPF"s determination that the creamery was "compatible with agriculture" and a permissible use under Maryland law. He determined that "since 'Agriculture, Commercial' is defined in the B.C.Z.R. to include ancillary activities such as 'processing, packing, marketing or distributing,' the activities proposed for the Prigel Family Creamery are appropriate in the R.C.2 Zone[,]" permitting Bellevale to construct the proposed facility. The LGVA and the Yoders appealed the Commissioner's decision to the local Board of Appeals, but dismissed that appeal before the Board decided the case.

---

14. Roger Hayden, President of the LGVA, Charlotte Pine, and Catherine Ebert were also petitioners, with Pine and Ebert as apparent members of the LGVA.

15. Sections 500.7 and 500.6 of the B.C.Z.R. vest the Baltimore County Zoning Commissioner with the authority to conduct hearings and pass orders to enforce the zoning regulations.

## B. Before the Circuit Court for Baltimore County

On 15 May 2008, the Yoders filed in the Circuit Court for Baltimore County a Complaint for Injunctive, Mandamus, and Declaratory Relief against Bellevale Farms, Bellevale Limited Partnership, the Prigel Family Creamery, the Prigels, ("the Bellevale defendants") and the MALPF,[16] advancing three requests for relief: (1) a Writ of Mandamus ordering the MALPF to enforce the terms of the Easement and provisions of State and County laws; (2) a declaration that the proposed creamery violates the Easement and State and County laws because it constitutes a commercial and/or industrial use;[17] and, (3) an order enjoining permanently Bellevale from constructing and operating the creamery and as violative of the Easement and State and County laws. An Amended Complaint filed two weeks later added the LGVA as a plaintiff and alleged that the plaintiffs would suffer irreparable harm if the defendants were permitted to violate the Easement and the provisions of state and local law, and that granting permanent injunctive relief would serve best the public interest.

The Bellevale defendants and the MALPF filed Motions to Dismiss and/or for Summary Judgment, suggesting commonly that the plaintiffs lacked standing to maintain the action.[18] The MALPF's motion asserted additionally that its decision to

---

**16.** Pursuant to Agric. § 2–504(1), the MALPF is authorized to sue, or be sued, in contractual matters where it is a party.

**17.** Plaintiffs contended, specifically, that "the proposed [operation] violates state law [Agric. § 2–513(a)(1)–(3)] because it would (1) constitute a commercial and/or industrial use rather than a farm use; (2) involve the operation of machinery that is not normally used in production; (3) constitute secondary, rather than primary processing of agricultural products; and (4) involve the sale of products not produced on Bellevale Farm[s]."

**18.** In their response to the defendants' Motion to Dismiss and/or for Summary Judgment, plaintiffs argued for their standing because (1) they are intended third-party beneficiaries of the Easement Agreement between the MALPF and the co-defendants; (2) the Easement is a charitable trust and, consequently, is enforceable by interested non-parties as members of the public; and, (3) they are harmed specially by the defendants' violations of the Easement Agreement.

allow the creamery was within its statutory authority and discretion, and thus insulated from judicial scrutiny.

The case was assigned to Judge John F. Fader II of the Circuit Court for Baltimore County. Judge Fader requested the parties to file additional memoranda in response to several issues raised in their pleadings that, in his view, required additional detail and information.[19] The parties responded.[20] After a hearing, Judge Fader issued on 24 March 2009 an Order and Declaratory Judgment granting the defendants' Motions for Summary Judgment and denying the plaintiffs' Motions for Summary Judgment.[21] He reasoned that the plaintiffs lacked standing to bring the action as third-party beneficiaries or "interested persons" under the Easement, but noted that "[i]t is the right of the Plaintiffs to carry their dispute with the Defendants through the zoning, planning and

---

**19.** Judge Fader requested the parties to address the following questions in their memoranda: "(1) Does the legislative history support the standing of Plaintiffs or offer guidance as to whether other landowners may enforce the MALPF easement? (2) Is there any persuasive case from another jurisdiction which relies on a similar statute? (3) Does the Restatement contain any guidance on the standing issue? (4) Does *First United Pentecostal Church of Hagerstown v. Seibert* [*Seibert*, 22 Md.App. 434, 323 A.2d 668 (1974)] modify or set forth some standard apart from the Restatement on standing? (5) Does the permission by [the] MALPF granted for the creamery operation fall within what is allowed by the easement?"

**20.** On 29 August 2008, the defendants filed also a supplemental Motion to Dismiss as to all defendants, save Bellevale Farms Limited Partnership, on the ground that they are not parties to the Easement.

On 7 October 2008, the plaintiffs filed Motions for Summary Judgment, contending that they were entitled to relief because the MALPF admitted in pleadings filed with the Circuit Court that the creamery was a "commercial" operation. As their argument went, because of that "admission," as a matter of law, the creamery was a commercial use prohibited by the terms of the Bellevale Easement.

**21.** The trial court explained that "neither the legislative history of the MALPF [sic] enactment, the wording of the Statutory scheme or any COMAR regulation enacted pursuant to the statute indicate any intent to allow a taxpayer, an adjoining property owner, or any other individual or entity to challenge the decision made by [the] MALPF to approve the creamery operation by direct application of the primary jurisdiction with this court."

permit process of land use.... Any citizen who qualifies for standing in the administrative process may initiate that process with Baltimore County government." Judge Fader dismissed all other counts of the plaintiffs' Amended Complaint.

### C. Before the Court of Special Appeals

The LGVA and the Yoders appealed the judgment of the Circuit Court, challenging the trial court's conclusion that they lacked standing to bring an action against Bellevale's proposed construction of a creamery operation on the basis that the Bellevale Easement is a charitable trust and, consequently, is enforceable by non-party interested persons as members of the public.[22]

In a reported opinion,[23] the Court of Special Appeals held that the Easement Agreement did not reflect that Bellevale, the Grantor, had a charitable intent to benefit either the Yoders, LGVA, or members of LGVA, or that the Bellevale Easement had a charitable purpose and, therefore, the Bellevale Easement did not create a charitable trust.[24] *Long Green*

---

**22.** Two other grounds were placed before the intermediate appellate court, but are not before us. Those assertions were that Appellants are intended third-party beneficiaries of the Bellevale Easement Agreement and that they are harmed specially by the Appellees' alleged violations of the Bellevale Easement Agreement. *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md.App. 636, 653, 683–84, 46 A.3d 473, 483–84, 502 (2012). The Court of Special Appeals held that (1) the LGVA and its members were not third-party beneficiaries to the Bellevale Easement and, (2) the Yoders, as owners of property adjacent to Bellevale Farms, were prima facie aggrieved by the MALPF's alleged failure to enforce the easement. *Id.* at 653–59, 684–89, 46 A.3d at 484–87, 502–05. The court concluded also that the LGVA and its members' failure to proceed with judicial review in the zoning challenge to the decision of the Deputy Zoning Commissioner against the Appellees did not constitute a failure to exhaust administrative remedies. *Id.* at 689–91, 46 A.3d at 502. The Bellevale Respondents did not file a cross-petition for Writ of Certiorari with us.

**23.** The revised opinion that we consider was filed after the intermediate appellate court granted the MALPF's Motion for Reconsideration. Petitioners filed also a Motion for Consideration, which was denied.

**24.** The Court of Special Appeals, in reaching its holding, assumed, "without deciding, that an agricultural preservation easement pur-

*Valley Ass'n v. Bellevale Farms, Inc.,* 205 Md.App. 636, 683, 46 A.3d 473, 501 (2012). The intermediate appellate court noted that the language of the Bellevale Easement belied Petitioners' contention that it was created with an intent to create a charitable trust or with a charitable purpose. *Id.* at 673–83, 46 A.3d at 497–502. The court concluded, rather, that the Easement Agreement's terms and the statutory scheme of the MALPF program indicated that the Bellevale Easement was a product of a state-funded program to improve the feasibility of profitable farming.[25] *Id.* Appellants filed a Petition for Writ of Certiorari to this Court. We granted the petition on 21 September 2012.

D. Questions Presented and the Parties' Contentions

The parties dispute whether the grant of an agricultural preservation easement to the State, in the person of the MALPF, created a charitable trust, thereby entitling non-party interested persons, such as the LGVA and the Yoders, to file an action seeking to enforce that easement, when the State, in the Petitioners' view, "failed to do so[.]"[26]

---

chased by MALPF or the State for the benefit of MALPF qualifies as a 'conservation easement[.]'" *Long Green Valley Ass'n,* 205 Md.App. at 671, 46 A.3d at 494.

25. The court observed further that the Easement was "potentially" non-perpetual because Agric. § 2–514 provides an approach for the termination of the easement after twenty-five years, under certain circumstances.

26. Petitioners present three questions in their petition:

1. Whether the grant of an agricultural preservation easement to the State of Maryland creates a charitable trust such that interested third parties have standing to file an action seeking its enforcement when the State has failed to do so?
2. Is an easement "charitable" in nature when it is sold to the State for less than the value of the surrendered development rights and when that uncompensated value may be treated as a charitable contribution for state and federal income tax purposes?
3. Is an expressly perpetual easement rendered non-perpetual simply because there is a statutory scheme that enables certain qualified grantors, in limited circumstances, to terminate their easements after 25 years?

In its Brief, the MALPF included a Motion to Dismiss Petitioners' appeal, contending that the doctrines of res judicata and/or collateral estoppel rendered moot Petitioners' asserted grounds for relief in the present case because the Court of Special Appeals addressed allegedly the same grounds in *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md.App. 264, 47 A.3d 1087 (2012), a subsequently decided and related appeal.[27] The gravamen of the MALPF's and Bellevale Respondents' argument on the merits is that the Bellevale Easement did not create a charitable trust within the meaning of Title 14, Subtitle 3 of the Estates and Trust Article.[28] Consequently, Respondents contend the LGVA and the Yoders are not persons "having an interest in enforcement of the trust" under the meaning of Est. & Trusts § 14–302(a),[29] and cannot challenge the Bellevale Respondents' right

---

Because we conclude that the Bellevale Easement is not a charitable trust under Title 14, Subtitle 3 of the Estates and Trust Article and the case law interpreting that statute, we do not decide directly the second and third questions.

**27.** On 2 April 2013, the MALPF filed in the present case a Motion to Supplement the Record "for the benefit of the Court's consideration of the Foundation's motion to dismiss on grounds of mootness and *res judicata* or collateral estoppel." The MALPF asked the following to be added to the record: a copy of the Appellants' Brief and Appendix as well as the Appellees' Brief and Appendix in *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md.App. 264, 47 A.3d 1087 (2012). We deferred our ruling on the motion until oral argument of the present appeal. As we explain further in this opinion, the MALPF's Motion to Supplement the Record is denied because the supplemental materials are unnecessary to our understanding of and deciding the MALPF's Motion to Dismiss.

**28.** Title 14, Subtitle 3 of the Estates and Trust Article governs the creation and administration of charitable trusts.

**29.** Est. & Trusts § 14–302(a) provides, in pertinent part:

If a trust for charity is or becomes illegal, or impossible or impracticable of enforcement or if a devise or bequest for charity, at the time it was intended to become effective, is illegal, or impossible or impracticable of enforcement, and if the settlor or testator manifested a general intention to devote the property to charity, a court of equity, on application of any trustee, *or any interested person*, or the Attorney General of the State, may order an administration of the

to construct and operate a creamery on Bellevale Farms, in accordance with the Easement Agreement and the MALPF's consent. Naturally, Petitioners aver that the Bellevale Easement created a charitable trust, and that they are entitled, as "interested persons" under Est. & Trusts § 14–302(a), to challenge the Prigels' construction and operation of a creamery on Bellevale Farms.

First, we deny the MALPF's Motion to Dismiss because the matter at issue in *Long Green Valley Ass'n v. Prigel Family Creamery,* 206 Md.App. 264, 47 A.3d 1087 (2012), is distinct as a matter of law from that involved in the current case and, therefore, res judicata and/or collateral estoppel do not render Petitioners' present appeal moot. Next, we hold penultimately that the deed of easement does not reflect any indication that either Bellevale or the MALPF, in the sale and purchase of the Bellevale Easement, (1) manifested an intent for the Easement to be a charitable trust, or (2) had a charitable purpose in creating the Bellevale Easement. Therefore, we hold ultimately that the Bellevale Easement does not satisfy the elements required to create a valid charitable trust and Petitioners do not have standing to maintain a cause of action under Est. & Trusts § 14–302(a) to seek to enforce the Easement.

## DISCUSSION

### A. STANDARDS OF REVIEW

■ The trial court granted Respondents' motions for summary judgment, dismissed Counts I, II, and IV of the complaint, and issued a declaratory judgment that Petitioners lacked standing.[30] We review an appeal from an order enter-

---

trust ... as nearly as possible to fulfill the general charitable intention of the settlor or testator.
(Emphasis added.)

**30.** Judge Fader, in relying on facts plead outside of the four corners of the relevant complaint, treated the defendants' initial Motion to Dismiss and/or for Summary Judgment effectively as a Motion for Summary

ing summary judgment by considering the record in the light most favorable to the non-moving party. *Gourdine v. Crews,* 405 Md. 722, 735, 955 A.2d 769, 777 (2008); *Harford County v. Saks,* 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a grant of a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party."). *See* Md. Rule 2–501(f) (a trial court grants a motion for summary judgment "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.").

 Because there is no genuine dispute as to any fact material to the resolution of this case, we apply a non-deferential standard to determine whether the trial court erred as a matter of law in entering summary judgment. *Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium,* 404 Md. 560, 571, 948 A.2d 11, 18 (2008). Likewise, we apply a non-deferential standard in our consideration of whether the trial court's declaratory judgment was correct as a matter of law. *Atkinson v. Anne Arundel C'nty,* 428 Md. 723, 741, 53 A.3d 1184, 1195 (2012).

## B. ANALYSIS

### 1. The MALPF's Motion to Dismiss

 The MALPF contends first that the doctrine(s) of res judicata and/or collateral estoppel render moot the present appeal because the Court of Special Appeals, in *Long Green Valley Ass'n v. Prigel Family Creamery ("Prigel"),* 206 Md. App. 264, 47 A.3d 1087 (2012), "rejected the same legal

---

Judgment. *Nickens v. Mount Vernon Realty Group, LLC,* 429 Md. 53, 62–63, 54 A.3d 742, 748 (2012) (" '[P]ursuant to Maryland Rule 2–322(c), when a trial judge is presented with factual allegations beyond those contained in the complaint to support or oppose a motion to dismiss and the trial judge does not exclude such matters, then the motion shall be treated as one for summary judgment.' ") (quoting *Okwa v. Harper,* 360 Md. 161, 177, 757 A.2d 118, 127 (2000)).

challenge to the creamery and retail operation that is asserted in the case now on appeal[.]" Res judicata and collateral estoppel are common law doctrines designed to preclude the relitigation of either the same cause(s) of action or same legally determinative issue(s), respectively, decided in a prior action. *See Powell v. Breslin,* 430 Md. 52, 63, 59 A.3d 531, 537–38 (2013) (discussing the affirmative defense of res judicata); *Rourke v. Amchem Products, Inc.,* 384 Md. 329, 340–41, 863 A.2d 926, 933 (2004) (explaining the doctrine of collateral estoppel). Because we conclude that the matter at issue in *Prigel* is distinct as a matter of law from the matter involved in the present appeal, we deny the MALPF's Motion to Dismiss.

In March 2006, Prigel Family Creamery (one of the Respondents in the present case), filed a petition for special exception with the Baltimore County Deputy County Zoning Commissioner, seeking approval for a "Farm Market" or, alternatively, for a "Farmer's Roadside Stand[,]" pursuant to the Baltimore County Zoning Regulations ("B.C.Z.R."). *Prigel,* 206 Md.App. at 266–67, 47 A.3d at 1088. The Prigels requested the special exception in order to construct the 10,000 square foot building to house the creamery, the 1,500 square foot retail store, and a parking area adjacent to the latter building to accommodate up to eight vehicles. *Id.* at 268, 47 A.3d at 1089.[31] The petition was granted in March 2010, over the opposition of the LGVA, the Yoders, Carol Trela, and Caroline Pine (Trela and Pine as apparent members of the LGVA). *Id.* at 266, 47 A.3d at 1088. The Board of Appeals's decision was brought before the Circuit Court for Baltimore County on judicial review (which affirmed), and then to the Court of Special Appeals in April 2011. *Id.* at 266–67, 47 A.3d at 1088.

The questions presented to the intermediate appellate court were:

---

**31.** The Easement on Bellevale Farms, where Prigel Family Creamery operates, required the Prigels to seek the permission of the MALPF to construct the building and parking lot. As explained earlier in this opinion, the MALPF approved the request in 2007. *Prigel,* 206 Md.App. at 268, 47 A.3d at 1089.

1. Was the Board of Appeals legally correct in finding that the special exception requirements had been satisfied for the Farm Market?

2. Was the Board of Appeals legally correct in finding that the B.C.Z.R. criteria had been satisfied for the Farmer's Roadside Stand?

*Id.* at 267, 47 A.3d at 1088–89.

Hence, the central legal issue in *Prigel* was whether the special exception for a farm market or farmer's roadside stand at the Prigel Family Creamery was approved properly and correctly under the B.C.Z.R. None of the parties in *Prigel* asked the intermediate appellate court to decide whether the Bellevale Easement was a charitable trust. As *Prigel* and the current case are distinct significantly in their causes of action and legally determinative issues, we conclude that neither res judicata nor collateral estoppel preclude the present appeal.

## 2. The Bellevale Easement Did Not Create a Charitable Trust

A litigant must have standing to maintain a judicial action. *120 West Fayette Street, LLLP v. Mayor of Baltimore,* 407 Md. 253, 270, 964 A.2d 662, 671–72 (2009) (citations omitted). Standing may be grounded on a statute conferring a legal interest or privilege. *See Committee for Responsible Dev. on 25th St. v. Mayor & City Council,* 137 Md.App. 60, 72, 767 A.2d 906, 912 (2001) (standing is based on a legal interest "such as 'one of property', one arising out of a contract, one protected against tortious invasion, or one founded on a statute that confers a privilege") (citations omitted). Petitioners contend that, when the Bellevale Respondents sold the Easement to the MALPF, a government agency with the objective of preserving agricultural uses for farmland, the Easement constituted a charitable trust for the benefit of the public. Consequently, Petitioners argue, they are "interested person[s]" under Est. & Trusts § 14–302(a) and have standing to invoke the judicial process to enforce their view of the Bellevale Easement Agreement. We disagree.

 Explaining why we reach this position begins with a recitation of the established rules of construction when interpreting an instrument that creates an easement. The Bellevale Easement was created by deed. We interpret an easement created by deed, an express grant, through a "proper construction of the conveyance by which the easement was created." *Maryland Agric. Land Preserv. Found. v. Claggett*, 412 Md. 45, 62, 985 A.2d 565, 575 (2009) (applying the rules of construction of contracts to interpreting the extent of an easement created by express grant) (quoting *Miller v. Kirkpatrick*, 377 Md. 335, 351, 833 A.2d 536, 545 (2003)). *See Chevy Chase Land Co. v. United States*, 355 Md. 110, 143, 733 A.2d 1055, 1073 (1999) ("[T]he primary consideration in construing the scope of an express easement is the language of the grant."). The intention of the parties at the time the easement was granted is the North Star guiding our interpretation of it. *See Miller*, 377 Md. at 351, 833 A.2d at 545 ("The grant of an easement by deed is strictly construed.... '[A] court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible.'") (citations omitted). Therefore, our focal point is "the language of the agreement itself[,]" seeking to discern "'what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Claggett*, 412 Md. at 62–63, 985 A.2d at 575–76 (quoting *White v. Pines Community Improvement Ass'n, Inc.*, 403 Md. 13, 32, 939 A.2d 165, 176 (2008)).

 Where the instrument includes clear and unambiguous language of the parties' intent, we will not sail into less charted waters to interpret "'what the parties thought that the agreement meant or intended it to mean.'" *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 392–93, 897 A.2d 206, 217 (2006) (quoting *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)). Rather, we resort to extrinsic evidence in constructing an easement only "when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question[.]" *City of Bowie v. MIE, Props., Inc.*,

398 Md. 657, 681, 922 A.2d 509, 523 (2007). Generally, it is the court's role to determine whether the language of an easement manifests an intent for "a third party to have standing to enforce ... contractual provisions[.]" *Volcjak v. Washington County Hosp. Ass'n,* 124 Md.App. 481, 509, 723 A.2d 463, 477 (1999). *See First United Pentecostal Church v. Seibert,* 22 Md.App. 434, 440, 323 A.2d 668, 672 (1974) ("Who was intended to benefit from the covenant, with the correlative right to enforce the restrictions, presents a fact question which turns upon the intention of the original parties to the agreement.").

 Petitioners aver that the language of the Bellevale Easement and evidence extrinsic to its creation indicate that Respondents intended to create a charitable trust for the benefit of the public. "A trust exists where the legal title to property is held by one or more persons, under an equitable obligation to convey, apply, or deal with such property for the benefit of other persons." *From the Heart Church Ministries, Inc. v. African M.E. Zion Church,* 370 Md. 152, 181–82, 803 A.2d 548, 566 (2002) (citing *Milholland v. Whalen,* 89 Md. 212, 213–14, 43 A. 43, 43–44 (1899)). Generally, trusts

> may be express or implied, a subset of which includes resulting or constructive trusts. *See Springer v. Springer,* 144 Md. 465, 475–76, 125 A. 162, 166–67 (1924). Express trusts are created by the direct and willful acts of the parties, by some writing, or deed, or words expressly evidencing the intention to create a trust. *See Levin v. Security Financial Ins. Corp.,* 246 Md. 712, 721, 230 A.2d 93, 98 (1967) (citing *Sieling v. Sieling,* 151 Md. 536, 135 A. 376 (1926)); *Sieling v. Sieling,* 151 Md. 536, 548–50, 135 A. 376, 381 (1926). A charitable trust is considered an express trust. Restatement (Second) of Trusts § 349 at 213 (1959)[.]

*Id.* at 182–83, 803 A.2d at 566–67. Because a charitable trust is an express trust, the person seeking to establish the trust has the burden to prove, by clear and convincing evidence, that a charitable trust exists. *Id.* at 183, 803 A.2d at 567 (citing *Kelley v. Kelley,* 178 Md. 389, 399, 13 A.2d 529, 533

(1940) ("an express, resulting or constructive trust must be proven by clear and convincing evidence"); *Masters v. Masters,* 200 Md. 318, 332, 89 A.2d 576, 582 (1952)).

▮▮ At its most basic function, a charitable trust is "[a] fiduciary relationship with respect to property arising as a result of a *manifestation of an intention* to create it[.]" *Restatement (Second) of Trusts* § 348 (1959) (emphasis added); *see Rosser v. Prem,* 52 Md.App. 367, 374, 449 A.2d 461, 465 (1982). The person who holds the property in trust must abide by "equitable duties to deal with the property for a *charitable purpose." Restatement (Second) of Trusts* § 348 (emphasis added). In contrast to a private trust, which is "devoted to the use of specified" and designated beneficiaries of the trust, "a charitable trust property is devoted to purposes beneficial to the community." *Restatement (Second) of Trusts,* Introductory Note to Ch. 11. To create a charitable trust in Maryland, (1) a fiduciary relationship must exist between the parties;[32] (2) the trust must identify a trustee(s)' duties;[33] (3) a property must be held in trust; (4) a manifestation of intention to create a charitable trust must be present; and, (5) the trust must have a charitable purpose. *Restatement (Second) of Trusts* § 348; *see Rosser,* 52 Md.App. at 377, 449 A.2d at 467.

▮▮ First, in contrast to private trusts, "[n]o particular form of words or conduct is necessary" to manifest an intent to create a charitable trust. *Restatement (Second) of Trusts*

---

**32.** "The trustee of a charitable trust, like the trustee of a private trust, is normally under a duty not to delegate to a third person the performance of his duties as trustee; as to matters within the scope of the relation he is under a duty not to profit at the expense of the trust estate and not to enter into competition with the trust estate." *Restatement (Second) of Trusts,* § 348, cmt. a.

**33.** Generally, a trustee for a charitable trust has the same duties as a trustee for a private trust, such as: (1) administering the trust for charitable purposes; (2) maintaining clear and accurate accounts regarding the administration of the trust; (3) exercising reasonable due care in administering the trust; and, (4) defending actions "which may result in a loss to the trust estate, unless it is reasonable not to make such a defense." *Restatement (Second) of Trusts,* § 379, cmt. a.

§ 351, cmt. b.[34] Rather, the key factor in discerning an intent to create a charitable trust is "[the settlor's] purpose and intention, rather than the use of any particular term," and, hence, "a trust will not be created where none in fact was contemplated." *From the Heart Church Ministries,* 370 Md. at 182, 803 A.2d at 566, (citing *Doty v. Ghinger,* 166 Md. 426, 429, 171 A. 40, 42 (1934)). *See* Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 2.8, at 50 (4th ed.1987) (explaining that a valid charitable trust exists "if what [the parties] appear to have in mind is in its essentials what the courts mean when they speak of a trust[,]" even though "the parties do not call it a trust, and even though they do not understand what a trust is[.]").

Second, Est. & Trusts § 14–301(b) provides that a charitable trust may incorporate "all purposes within either the spirit or letter of the statute of 43 Elizabeth ch. 4 (1601), commonly known as the statute of charitable uses." [35] Among the recognized purposes of a charitable trust are: " '(a) the relief of poverty; (b) the advancement of education; (c) the advancement of religion; (d) the promotion of health; (e) governmental or municipal purposes; [and,] (f) other purposes the accomplishment of which is beneficial to the community.' " *Rosser,* 52 Md.App. at 374, 449 A.2d at 465 (quoting *Restatement (Second) of Trusts* § 368). Essentially, however, "[a] charitable purpose may be found in 'almost anything that

---

**34.** Comment C of Section 351 of *Restatement (Second) of Trusts* provides two contrasting illustrations of where an intention to create a charitable trust may (or may not) found:

1. "A" bequeaths $10,000 to "B" and also bequeaths the residue of his property to "B" "desiring him" to apply the property to a charitable purpose. In the absence of evidence showing a different intention of "A", "B" holds the residue upon a charitable trust.
2. "A" devises and bequeaths all his property to "B", his wife. In the will he expresses a hope that on her death she will leave the property for charitable purposes. In the absence of evidence showing a different intention of "A", "B" is entitled beneficially to the property and does not take it on a charitable trust.

**35.** 43 Elizabeth ch. 4 (1601) was incorporated into Maryland law in the Statute of Charitable Uses, adopted in 1931.

tends to promote the well-doing and well-being of social man[.]' " *Rosser*, 52 Md.App. at 384, 449 A.2d at 470 (quoting *Ould v. Washington Hospital for Foundlings*, 95 U.S. 303, 311, 24 L.Ed. 450 (1877)).[36]

Unlike the requirements for a private trust, an ascertainable and designated beneficiary is not necessary for the creation or existence of a charitable trust. Est. & Trusts § 14–301(c) ("A charitable trust shall not be held invalid or unenforceable merely because the beneficiaries of the trust constitute an indefinite class."); *Rosser*, 52 Md.App. at 374–75, 449 A.2d at 465 ("It is . . . undisputed that a charitable trust can be created without a definite or definitely ascertainable beneficiary designated[.]"). Hence, "any person having an interest in enforcement" of a charitable trust may pursue an equitable or judicial remedy to enforce the charitable trust. Est. & Trusts § 14–301(a). Furthermore, "[a] charitable trust is not invalid although by the terms of the trust it is to continue for an indefinite or unlimited period." *Restatement (Second) of Trusts* § 365.

Petitioners failed to present clear and convincing evidence that the Bellevale Easement is a charitable trust, and thus failed to show that they are entitled to enforce the provisions of the Easement or the Bellevale Easement Agreement between the Respondents. As explained above, our first step in interpreting whether Respondents intended the Bellevale Easement to constitute a charitable trust is to look at the language of the deed of easement. We resort to evidence extrinsic to the instrument only where the parties' language in the instrument is unclear and ambiguous.

We turn now to the crux of the dispute—whether the Respondents manifested an intent in the Bellevale deed of easement for the Easement to constitute a charitable trust,

---

**36.** Comment F of *Restatement (Third) of Trusts* § 28 explains further that "a trust is charitable if its purpose is to promote . . . environmental quality. . . . Thus, a trust to beautify a city or preserve the beauties of nature, or otherwise to add to the aesthetic enjoyment of the community, is charitable."

and whether the Bellevale Easement has a charitable purpose. Petitioners' argument concentrates on evidence extrinsic to the language of the deed to contend that the Bellevale Easement manifested an intent to create a charitable trust.[37] We conclude, however, that Petitioners rush too quickly past the express terms of the Bellevale Easement Agreement.

The Bellevale Easement Agreement does not indicate that Bellevale, as Grantor, intended for the MALPF to "deal with [the] property for the benefit of other persons[,]"—a required element of a valid charitable trust. *From the Heart Church Ministries,* 370 Md. at 181–82, 803 A.2d at 566. Rather, the deed of easement explains that it is "the intention of the parties that the said land shall be preserved solely for agricultural use in accordance with the provisions of the Agricultural Article." Who is entitled to preserve the land for agricultural use, and thus benefit from that use, is explained in each of the Easement Agreement's sub-parts. For example, the introductory sub-part to "COVENANTS, CONDITIONS, LIMITATIONS AND RESTRICTIONS," states that it is the *"Grantor* [who] covenants for and on behalf of Grantor, the *personal representatives, successors and assigns of the Grantor,* with the *Grantee, its successors and assigns,* to do and refrain from doing upon the above described land all and any of the

---

37. In support of their arguments, Petitioners refer frequently to *Attorney General v. Miller,* Civil Action No. 20–C–98–003486, 1998 WL 35318061 (Cir.Ct. for Talbot County, 1998) (also known as the "Myrtle Grove" case), a trial court case that was not adjudicated fully at trial and culminated ultimately in a settlement nearly fourteen years ago. Petitioners assign erroneous and undue weight to this non-precedential case. Moreover, Petitioners misuse the Myrtle Grove case to contend (apparently) that, because the Office of the Attorney General of Maryland argued in that case that a property owner's grant of an easement to the State created a charitable trust for the benefit of Maryland citizens, the formal position of the Attorney General with respect to a "conservation agreement" in all cases and for all time is that it creates a charitable trust. Apart from the differences in the factual history of the Myrtle Grove case (the Myrtle Grove easement was donated as a gift to a non-profit charitable corporation) and this case, nothing in the record of the Myrtle Grove case supports the notion that all agricultural preservation easements are the equivalent of charitable trusts. *See* Nancy A. McLaughlin, *Conservation Easements: Perpetuity and Beyond,* 34 Ecology L.Q. 673, 690–93 (2007).

various acts set forth...." (Emphasis added.) Section B employs similar language providing that *"the parties, for themselves, their personal representatives, successors and assigns,* further covenant and agree as follows...." (Emphasis added.)

Other clauses in the deed offer further indication that Bellevale and the MALPF intended the Easement to benefit the Grantor and Grantee only. For example, Section B(5) of the Easement Agreement provides that the State, "to the use of the Department of Agriculture on behalf of" the MALPF, may enforce the Easement, but excludes expressly any other individual from enforcing it. Moreover, in Section B(4), it states that the Grantee, and not any member of the public, has "the right to enter on the above described land from time to time for the sole purpose of inspection and enforcement of the easement, covenants, conditions, limitations and restrictions...." Lastly, it is the MALPF, and no other entity, that is entitled to determine whether any proposed use of Bellevale Farms may violate the provisions of the easement. Hence, the Bellevale Easement provides, in the first instance, only the Grantor and Grantee the authority to compel compliance with the Easement's restrictions, to the sole benefit of the named parties.

The inclusion of these provisions indicates that the MALPF and the Bellevale Respondents intended for the Easement to track the principal objective of the MALPF program, which is to "promote the continued availability of agricultural supplies and markets for agricultural goods." Agric. §§ 2–502(d), 2–509(d)(3). We need not resort to extrinsic evidence in parsing the plain meaning of the Respondents' intent because the language of the Bellevale Easement demonstrates clearly that the Respondents did not intend for the Easement to impose a charitable trust. *See Garfink,* 392 Md. at 392–93, 897 A.2d at 217; *City of Bowie,* 398 Md. at 681, 922 A.2d at 523–24.

Petitioners argue that "[t]he statutory and regulatory scheme governing the MALPF program demonstrates overwhelmingly that the primary and motivating purpose of the

program is to provide a public benefit through the preservation of rural land and open space, curbing urban blight, and providing a continued source for agricultural products." We are persuaded, however, that the language of the Easement Agreement and the MALPF program's statutory scheme demonstrate that the principal objective of the Bellevale Easement is not charitable, but rather concerned with maintaining agriculture as a profitable endeavor. We settle on this view by looking to the language of the Easement Agreement. Several terms and provisions included in the Bellevale Easement signal that the parties intended that the definition of "agricultural use" include making economic the ongoing use of farmland as such, and not primarily the preservation of "open space [and] curbing urban blight[.]" For example, Section [A](3) of the deed of easement identifies "exceptions" to the general prohibition against using the land for "any commercial, industrial, or residential purpose." Specifically, it provides:

> The *Grantor reserves the right to use the above described land for any farm use,* and to carry on all normal farming practices, *including the operation at any time of any machinery used in farm production or the primary processing of any agricultural products;* the right to conduct upon the said land any agricultural operation which is in accordance with good husbandry practices and which does not cause bodily injury . . . *including any operation directly relating to the processing, storage, or sale of farm, agricultural, or woodland products produced on the said above described land;* and all other rights and privileges not hereby relinquished, including the Grantor's right of privacy.

(Emphasis added.)

Section [A](3) does not propose as an express purpose of the Easement to conserve rural land and curb "urban blight"—indeed, those phrases are not found in the deed of Easement. Instead, the Easement states expressly that the "agricultural" use to which Bellevale Farms is restricted includes farm operations "relating to the processing, storage, or sale of farm,

agricultural, or woodland products" as long as they are "produced on the said above described land[.]" Hence, the prohibition in Section [A][1] of using Bellevale Farms for a "commercial, industrial, or residential purpose" excludes from its reach conducting development and sale operations on Bellevale Farms of "farm, agricultural, or woodland products" as permitted by Section [A](3).

The language of Section [A](3) is consistent with Section 2–513 of the Agriculture Article as it existed at the time the Easement was executed in 1997, which also prohibited the "commercial, industrial, or residential" use of farmland, but permitted the "[o]peration at any time of any machinery used in farm production or the primary processing of agricultural products[,]" and "[a]ll normal agricultural operations performed in accordance with good husbandry practices which do not cause bodily injury ... including, but not limited to, sale of farm products produced on the farm where such sales are made." Agric. § 2–513(a)(2)–(3). Thus, it is reasonable to conclude that "normal agricultural operations," such as the sale and processing of farm products, are not included in the statute's definition of the prohibited "commercial [or] industrial" uses of farmland. The same permitted uses of Bellevale Farms for purposes of profitable farming and sale of farm products, rather than for a charitable preservation of land for public use and enjoyment, are evident in Section [A](3) of the Bellevale Easement.

Resort, if need be, to the statutory scheme of the MALPF program provides further support for the conclusion that the Bellevale Easement has no charitable purpose. Petitioners seem to rely on the notion that, because the MALPF is a state agency, the undisputed objective of the MALPF program—which is to foster agriculture in Maryland and, in order to do so, encourage the maintenance of farming practices—is charitable because the public-at-large benefits from the agricultural preservation easements purchased by the MALPF. Although public benefits potentially and incidentally flow from the MALPF program, we conclude that the overarching purpose of the program is not charitable because its primary goal is to

promote and enable profitable farming by purchasing easements in privately-maintained land. *See* Bogert, *Trusts and Trustees*, § 34, at 42 (3d ed. 2007) ("Often the word 'trust' is used in a non-technical sense denoting merely an obligation arising out of the acceptance of the dedicated property" by a government agency, but that does not mean "the [government agency] became a trustee for charitable purposes.").

As we explained *infra,* the MALPF program aids landowners who seek to improve the profitability of their land for agricultural enterprise by providing restrictions and appraisal methods that increase land profitability while ensuring the agricultural use of farmland. *See* Agric. § 2–509(d). Although part of the legislative intent of the MALPF program is undeniably to "[c]ontrol the urban expansion" on Maryland's agricultural land and "protect agricultural land and woodland as open-space land[,]" the Legislature intended these collateral consequences to serve the principal purpose of the MALPF to "[p]rovide sources of agricultural products within the State for the citizens of the State[.]" Agric. § 2–501. Thus, the objective of the MALPF program is a balanced scheme of employing agricultural preservation to improve the profitability of farming in Maryland. Moreover, the MALPF does not consider purchasing an easement in land that is unsuitable for profitable farming, *see* Agric. § 2–514. The MALPF requires each interested landowner to undergo a rigorous application process, acquire county designation of the land as an agricultural district, satisfy strict eligibility criteria, and, finally, obtain the approval of the MALPF. In reaching its decisions, the MALPF considers appraisals and rankings of potential properties, lower acquisition prices for the interests in properties so as to maximize its limited financial resources (which tends to explain why less than full market value prices are paid generally for easements), and offers made in accordance with a formula established by the MALPF. *See* Agric. §§ 2–509, et seq.

The competitive application process leading up to the acceptance of an offer of purchase from the MALPF is demonstrated by the fact that many landowners who discount their

asking price improve their ranking in the competition to sell easements to MALPF. Lastly, and most importantly, the purchased easement must comply with the restrictions established by Agric. § 2–513. All of these moving parts in the MALPF program's statutory scheme reflect a program that is market-oriented and profit-driven, even if some consequential benefits flow to the general public in Maryland. The program and, therefore, the Bellevale Easement purchased through that program, are distinct significantly from those interests in property where we have found charitable trusts. *See, e.g., Register of Wills v. Cook,* 241 Md. 264, 277–78, 216 A.2d 542, 548 (1966) (where this Court concluded that a trust was charitable because it was created to foster the passage of the Equal Rights Amendment and preclude the effects of sexual discrimination in the laws of Maryland and the United States, despite "the views of individuals, laymen, or judges...."); *Second National Bank v. Second National Bank,* 171 Md. 547, 556–58, 190 A. 215, 219–20 (1937) (where this Court concluded that a trust establishing a home for "unfortunate girls" was charitable).

In sum, because the instrument creating the Bellevale Easement, as well as the statutory scheme of the MALPF program through which the Easement was purchased, do not indicate that Respondents intended to or created a charitable trust with a charitable purpose, we hold that Petitioners do not have standing under Est. & Trusts § 14–302(a) to maintain a cause of action to enforce the Easement according to their interpretation of its terms. Therefore, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**